**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

In re Omnicom ERISA Litigation

No. 20-cv-4141 (CM)

_____

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS**

McMahon, J.

This is a putative class action filed under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* by five plaintiffs who are current or former participants in Omnicom's 401(k) Group Retirement Savings Plan ("the Plan"). Plaintiffs allege three claims – the most important being a breach-of-fiduciary-duty claim – that pertain to the Plan. Their allegations include alleged mismanagement due to prolonged inclusion in the 401(k) plan of certain funds and excessive recordkeeping fees and expense ratios.

Before the Court is defendants' motion to dismiss. The motion is granted in part only to the extent of dismissing allegations related to investment funds in which the named plaintiffs did not invest. Because the plaintiffs could not have been harmed by any mismanagement of funds in which they did not invest by their own choice, they have not suffered any cognizable injury-in-fact that would confer Article III standing. For that reason, plaintiffs' allegations related to the Plan's offering of the Neuberger Berman and Morgan Stanley funds are dismissed.

Defendants' motion to dismiss is otherwise denied.

1

## I.   BACKGROUND

### A.  The Parties

This action is a putative class action. There are five named plaintiffs: Carol Maisonette (a resident of Des Plaines, IL); Shane Tepper (San Francisco, CA); Surfina Adams (Astoria, NY); Michael Mensack (Kennersville, NC); and Daniel Dise (Van Nuys, CA). The plaintiffs seek to represent the following class:

> All participants and beneficiaries in the Omnicom Group Retirement Savings Plan (the "Plan") at any time on or after May 29, 2014 to the present (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period. (Compl. at ¶ 65).

Each named plaintiff except for one "is a former employee of Omnicom and participant in the [Omnicom retirement] Plan under 29 U.S.C. § 1002(7)." (Compl. at ¶¶ 9, 11–13). Tepper is "a former employee of Omnicom and former participant in the Plan." (Compl. at ¶ 10).[1]

The complaint does not include details about which specific funds of the Plan the plaintiffs invested in, or how much they personally lost due to Omnicom's alleged mismanagement. In its motion to dismiss, Omnicom – "in the interests of candor and judicial efficiency" – disclosed that the Plan's records indicate that the plaintiffs invested in five of the Plan's funds during the relevant class period: the Fidelity Freedom 2015 K, 2030 K, 2045 K, 2050 K, and 2055 K target-date funds. (Dkt. No. 20 at 8; Dkt. No. 21, Exs. 1–5). These funds are part of the "Active Suite" of funds, which will be discussed in depth, below. *See* Section I.B.2, *infra*. For our purposes, the complaint will be deemed amended to include allegations to this effect.

Defendant Omnicom is a New York corporation headquartered in New York City. The complaint also alleges claims against Omnicom's Board of Directors, its Administrative

---

[1] Although the complaint alleges that Tepper is a "former participant" in the Plan, Omnicom's records disclosed as part of its motion to dismiss indicate that it is likely Adams who is the "former participant." Adam's account records showed a sizeable withdrawal just before the case was filed while Tepper's did not.

Committee, and Does 1 through 20 – individual members of the Administrative Committee whose names are currently unknown. The defendants are collectively referred to as "Omnicom."

### B. The Allegations

Plaintiffs sue derivatively on behalf of the Plan. They allege that Omnicom breached its fiduciary duties to the Plan.

The complaint claims three causes of action: (1) breach of fiduciary duty under ERISA §§ 404(a)(1)(A), (B), and (D) (codified at 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D)); (2) failure to monitor fiduciaries and co-fiduciaries; and (3) in the alternative, liability for a knowing breach of trust. The breach-of-fiduciary-duty claim is the most important because the other two claims are entirely dependent on that claim, meaning that if plaintiffs fail to state a claim for breach of fiduciary duty, they will have failed to state a claim for the other two causes of action as well. *See, e.g., Falberg v. Goldman Sachs Grp., Inc.*, No. 19-cv-9910 (ER), 2020 WL 3893285, at *15 (S.D.N.Y. July 9, 2020).

Plaintiffs assert four types of allegations: (1) imprudent management due to prolonged inclusion of the Fidelity Freedom Active funds in the Plan's investment menu; (2) imprudent management due to prolonged inclusion of the Neuberger Berman and Morgan Stanley funds (with those two being grouped together); (3) maintaining excessive recordkeeping and administrative fees; and (4) maintaining an unreasonably expensive investment menu.

### 1. The Plan

Omnicom offers its employees a defined-contribution 401(k) savings plan – the Omnicom Group Retirement Savings Plan. As of December 31, 2018, the Plan had 36,807 participants with account balances and assets totaling nearly $2.8 billion, placing it in the top 0.1% of all 401(k) plans by size. (Compl. at ¶ 4).

The Plan is a participant-directed 401(k) plan, meaning that "participants direct the investment of their contributions into various investment options offered by the Plan." (Compl. at ¶ 22). In 2018, the Plan offered its participants the opportunity to invest in a total of twenty-eight different funds, thirteen of which belonged to Fidelity's Freedom Active Suite of target-date funds. (*See* Compl. at ¶ 54). The complaint does not describe what information (if any) the Plan managers provide to Plan participants so that they can select the funds in which they wish to invest. However, the complaint makes clear that Plan participants have autonomy in making investment decisions, such as deciding which funds to invest in; Omnicom administrators did not make these choices for them. Omnicom does, however, offer a "default option" for participants who do not wish (or do not feel competent enough) to select their own investment portfolio. These funds are referred to as the Plan's "Qualified Default Investment Alternative." (Compl. at ¶ 31).

Each participant's Plan account is credited with contributions, employer matching contributions, any discretionary contributions, and the earnings and losses of the portfolio in which a participant is invested. The Plan pays expenses from Plan assets, and participants generally pay administrative expenses through a reduction of their investment income. (Compl. at ¶ 22).

2.  Fidelity Freedom Active Suite Funds

Most of plaintiffs' allegations concern the Fidelity Freedom Active Suite of Funds (the "Active Suite"). The Active Suite offers thirteen target-date funds[2], which are actively managed funds that shift the fund's asset allocation over time according to its "glide path." For example, as an investor gets closer to retirement, the target-date fund will increase the portfolio's holdings in bonds and decrease the portfolio's holdings in securities to decrease risk.

---

[2] These funds are the Income K, 2005 K, 2010 K, 2015 K, 2020 K, 2025 K, 2030 K, 2035 K, 2040 K, 2045 K, 2050 K, 2055 K, 2060 K. (Compl. at ¶ 44). The Index Suite has comparably named funds also tracking each target date.

The Plan offered participants the option to invest in the Active Suite from December 31, 2009 until at least December 31, 2018. During this time, the Active Suite was also the Plan's "Qualified Default Investment Alternative (QDIA)," which meant that new contributions were automatically directed to the Active Suite unless the participant directed the contributions to other funds. (Compl. at ¶ 31). Largely because of the Active Suite's status as the QDIA, it held approximately 32% of the Plan's total assets by December 2018. (*Ibid*.).

Plaintiffs allege that Omnicom breached its fiduciary duties by continuing to offer the Active Suite to participants, even though it was both riskier and more expensive than alternatives – specifically, the Active Suite's Index fund counterpart, the Fidelity Freedom Index funds (the "Index Suite"). The main difference between the two suites is that the Index Suite includes only Fidelity mutual funds that track market indices, whereas the Active Suite invests predominantly in actively managed funds to try to outperform the market indices. Plaintiffs allege that each Suite's glide path suggests that "the Active and Index suites appear to follow essentially the same strategy," given that each Suite's allocation of equities versus bonds follows the same pattern. (Compl. at ¶ 36). But because it is actively managed, the Active Suite charges more fees and has a higher expense ratio than the Index Suite. For example, the Institutional Premium share class for each target year of the Index Suite (the baseline fund) had an expense ratio of only 0.08%, while the K share of the Active suite had expense ratios ranging from 0.42% to 0.65%. (Compl. at ¶ 39).

Despite active management, the Active Suite has underperformed the index benchmarks. (Compl. at ¶¶ 44–45). The Index Suite outperformed the Active Suite in four out of the six years beginning in 2014 and continuing through 2020. (Compl. at ¶ 44). Plaintiffs also compared the performance of the two suites on a trailing three- and five-year annualized basis, as of August 31, 2020. On the three-year basis, the thirteen Active Suite funds underperformed the Index Suite by

a median of 1.04%, with underperformance ranging from 0.64% to as high as 1.24%. (*Ibid*.). On the five-year basis, the Active Suite underperformed the Index Suite by a median of 0.42%, with performance ranging from an outperform of 0.10% to underperformance of 0.61%. (*Ibid*.).

Plaintiffs also point out that each Index Suite fund bears an equal or higher rating by Morningstar – an industry analyst – than its Active Suite counterpart. (Compl. at ¶ 43). Apart from three (the Income, 2005, and 2060 iterations), every single one of the thirteen funds in the Index Suite received a full five-star rating from Morningstar. (*Ibid*.). In contrast, not a single one of the thirteen funds in the Active Suite has a five-star rating, and only one has a four-star rating.

Additionally, plaintiffs make specific allegations about the underlying funds that make up the mutual funds in the Active Suite. They point out that two of the largest funds in which the Active Suite is invested[3] – Fidelity's Intrinsic Opportunities Fund and its Large Cap Stock Fund – have "dramatically trailed their respective indices over their respective lifetimes." (Compl. at ¶ 35). The Intrinsic Opportunities Fund, which represents 8.13% of the total assets of the 2040– 2060 funds, has missed its benchmark Russell 3000 index by 326 basis points (3.26%) on an annualized basis over its lifetime. (*Ibid*.) The Large Cap Stock Fund, which represents 7.11% of total assets in the 2040–2060 funds, has trailed its benchmark S&P 500 Index by 357 basis points (3.57%) on an annualized basis over its lifetime. (*Ibid*.). Although the Active Suite portfolio is diversified among thirty-two underlying investment vehicles, these two funds represent over 15% of the portfolio's underlying assets and have consistently underperformed their benchmarks.

Plaintiffs allege that, because of the Active Suite's poor performance, many asset managers have withdrawn their investments in the Suite. For example, in 2018, the Suite experienced an

---

[3] The Active Suite funds are target-date mutual funds, which hold a variety of underlying investments. This means that each fund also invests in other mutual funds, hence the situation in which "Active Suite" funds are invested in other Fidelity funds – like the Intrinsic Opportunities Fund and the Large Cap Stock Fund.

estimated $5.4 billion in net outflows. In the four years prior to 2018, the Active Suite saw nearly $16 billion in total withdraws. (Compl. at ¶ 42). At the same time, the Index Suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone. (*Ibid*.).

Despite other asset managers recognizing the Active Suite's poor performance when compared to the Index Suite, Omnicom did not. Instead, Omnicom continued offering the Active Suite – and continued using it as the Plan's default option – until at least 2019, when it was finally replaced by the FIAM Blend Suite. (Compl. at ¶ 29). Plaintiffs allege that Omnicom's prolonged inclusion of the Active Suite in the Plan suggests imprudent Plan management in breach of its fiduciary duties under ERISA.

**3.** <u>The Neuberger Berman and Morgan Stanley Funds</u>

Omnicom replaced the Neuberger Berman Socially Responsive Fund Class R6 as an investment option in the Plan at some point in 2019, but plaintiffs allege that it had been consistently and significantly underperforming its benchmark – the S&P 500 Index – for many years and should have been replaced long before it was actually removed. (Compl. at ¶ 47). Plaintiffs allege that the Neuberger Berman fund underperformed the S&P 500 by as much as 2.92% on a trailing five-year basis and by as much as 1.74% on a trailing ten-year basis for the period between Q4 2014 through Q1 2020. (*Ibid*.). The fund also had a high expense ratio (0.59%) that was not justified in light of its performance. (Compl. at ¶ 48). Despite the Neuberger Berman fund's high fees and consistent underperformance, the Plan refused to replace it with a better-performing or cheaper alternative until 2019. Plaintiffs claim that Omnicom's prolonged inclusion of the fund supports an inference of imprudence.

Similarly, plaintiffs allege that the Plan imprudently invested in the Morgan Stanley Institutional Fund Inc. Small Company Growth Portfolio Class IS, which was expensive (0.93%

expense ratio), but which also consistently and significantly underperformed its benchmark (the Russell 2000 Growth Index). By the end of 2015, the fund lagged the benchmark by 3.55% on a trailing five-year basis and by 2.02% on a trailing ten-year basis. In comparison, the Vanguard Russell 2000 Growth Index Fund, which tracks the benchmark (and thus outperformed the fund during this period) had an expense ratio of just 0.08%. (*Ibid*.). Although Omnicom replaced the fund in its investment menu in 2017, plaintiffs allege that the change should have occurred much sooner, and that Omnicom's failure to do so was a breach of fiduciary duty. (Compl. at ¶ 49).

Significantly, none of the named plaintiffs invested in either of these funds.

### 4. Excessive Recordkeeping and Administrative Fees

Despite the Plan's having $2.8 billion in assets and 36,807 participants, it charged $34 per participant in recordkeeping fees and $12 per participant in administrative fees, for a total administrative cost of $46 – which plaintiffs allege is 37% to 60% more than comparable peers, or even than smaller plans. (Compl. at ¶ 51). One industry publication – "The 401(k) Averages Book" – noted that the average cost of recordkeeping and administration fees combined in 2017 for much smaller retirement plans – i.e., those with 100 participants and $5 million in assets – was only $35 per participant. (Compl. at ¶ 50). Yet plaintiffs allege that Omnicom – a Plan that had assets in the top 0.1% of all retirement plans – did not negotiate for or attempt to obtain less expensive fees. This was true even though Fidelity has acknowledged that its recordkeeping fees are generally worth no more than $14 to $21 per participant. (Compl. at ¶ 51).

In short, plaintiffs allege that Omnicom either knowingly allowed the Plan to pay excessive fees or was negligent by conducting no examination or comparison of fees in order to obtain better rates. Plaintiffs further allege that, as the administrator of such a large plan, Omnicom should have

been able to obtain lower fees. The fact that they did not do so supports an inference that Omnicom "fell asleep at the wheel."

    5. <u>Expensive Investment Menu</u>

Finally, plaintiffs claim that the Plan had an excessively expensive menu of investments that was not in the interest of participants. They allege that, in 2018, at least twenty of the Plan's twenty-eight funds were substantially more expensive than comparable funds in similarly sized plans. (Compl. at ¶ 54). For example, from 2014 to 2018, the Plan paid an average of 0.46% to 0.49% of its total assets in investment management fees alone, with the total cost of the Plan ranging from 0.53% to 0.55%. (Compl. at ¶ 55). In comparison, one study found that the average *total* plan cost for retirement savings plans with over $1 billion in assets was 0.28% of total assets as of 2017. (*Ibid.*).

Plaintiffs also allege that Omnicom failed to identify and include collective trusts in its investment menu where available. "Collective trusts are, in essence, mutual funds without SEC regulation." (Compl. at ¶ 24). Instead, they fall under the regulatory purview of the Office of the Comptroller of the Currency. Collective trusts are not offered to most investors but are created only for literal trust clients or for the employees of benefit plans, like the Omnicom Plan. (*Ibid.*). When available, they represent a more affordable option compared to comparable mutual funds. According to plaintiffs, this is due to the negotiability of fees, as larger plans can leverage their size for lower fees when compared to mutual funds. (*Ibid.*).

Plaintiffs point to three collective trusts that had lower expense ratios than comparable funds offered in the Plan.[4] (Compl. at ¶ 56). These collective trusts were allegedly comprised of

---

[4] These collective trusts were the Fidelity Diversified International Commingled Pool (expense ratio 0.58%); the Fidelity Contrafund Commingled Pool (0.43%); and the William Blair Small-Mid Cap Growth CIT (0.85%). Their expense ratios were all lower than comparable mutual funds offered by the Plan, which ranged between 0.63% to 1.10%. (Compl. at ¶ 56).

the same underlying investments than their mutual fund counterparts but charged lower fees. Plaintiffs claim that Omnicom's failure to identify and select collective trusts as part of the Plan's investment menu this raises an inference that it failed to prudently monitor the Plan. Again, it is an allegation that the Omnicom fiduciaries essentially fell asleep at the wheel.

## II.    DISCUSSION

### A.  Defendants' Rule 12(b)(1) Motion is Granted in Part and Denied in Part

Omnicom argues that plaintiffs lack standing to sue for injuries resulting to investors who had money in funds in which they did not personally invest.

For a federal court to have subject-matter jurisdiction over a case, a plaintiff must have standing – a requirement rooted in the Constitution's Article III's mandate that, "The judicial power" of the United States extends to only "cases" and "controversies." The " 'irreducible constitutional minimum' " of standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

In its motion papers, Omnicom faults plaintiffs for failing to identify the specific funds in which they were invested and the timeframe of the investment. However, Omnicom has that information, and "in the interests of candor and judicial efficiency," it has disclosed that information to the Court, which, as noted above, deems the complaint amended to include it. The Plan's records indicate that the plaintiffs invested in five of the Plan's target-date funds during the relevant class period: the Fidelity Freedom 2015 K, 2030 K, 2045 K, 2050 K, and 2055 K targeted-date funds. (Dkt. No. 20 at 8; Dkt. No. 21, Exs. 1–5). These funds are all part of the Active Suite. Omnicom's records also indicated that the plaintiffs were all participants in the Plan until at least

just before the lawsuit was filed. Omnicom has thus conceded that plaintiffs *do* have standing to sue – at least to redress injuries to the Plan incurred by virtue of the Plan's investment in the Active Suite. Although the named plaintiffs did not invest in all of the Active Suite's thirteen funds, they did invest in the product line, which gives them standing to sue on behalf of the Plan for injuries incurred as a result of investment in the product line.

The only issue is whether the named plaintiffs have standing to sue on behalf of injuries suffered by the Plan as a result of its investment in product lines in which they did *not* personally invest. Plaintiffs do not dispute that none of them invested in either the Neuberger Berman or Morgan Stanley funds during the class period.

There has been a great deal of litigation on this subject in recent years. After reviewing it, I conclude that Plaintiffs do indeed lack standing to sue for injuries from products in which they did not invest, because they could not have suffered a cognizable injury-in-fact because of Omnicom's allegedly poor investment decisions with respect to those funds. And I disagree with plaintiffs' assertion that my conclusion runs counter to any controlling Second Circuit precedent.

ERISA § 409(a), codified at 29 U.S.C. § 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Relatedly, ERISA § 502(a)(2) (codified at 29 U.S.C. § 1132(a)(2)) "confers standing" on those who can sue to enforce this provision. *Long Island Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty.*, 710 F.3d 57, 65 (2d Cir. 2013). The section provides that "A civil action may be brought – (2) . . . by a participant, beneficiary or fiduciary for

appropriate relief under section 1109 of this title." A "participant" is defined as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7).

The Supreme Court has held that 29 U.S.C. § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries" but that it "does authorize recovery for fiduciary breaches that impair the value of plan assets *in a participant's individual account*." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008) (emphasis added).

Plaintiffs argue they have standing to challenge *any* injury to the Plan, even in products in which they did not invest, because they are "participants" in the plan, and so have standing to assert derivatively any claim that the Plan itself could assert.

I conclude as follows:

1. *Thole v. U.S. Bank* is not an apposite precedent

Omnicom argues that a recent Supreme Court case – *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020) – fundamentally altered the standing analysis for derivative suits under ERISA, such that Plan participants lack standing to assert claims of general harm to the assets of a plan; rather, they can only assert claims based on *personal* monetary losses.

In *Thole*, the Court held that participants in defined-benefit retirement plans who "have not suffered (and will not suffer) any monetary losses" do not have Article III standing to sue derivatively on behalf of a plan because they have not suffered any personal injuries attributable to the plan's alleged mismanagement. *Id*. at 1649. *Thole*'s two named plaintiffs were participants in U.S. Bank's *defined-benefit* retirement savings plan. Like Plaintiffs here, they sued U.S. Bank

under ERISA for allegedly making poor investments on behalf of the plan, resulting in approximately $750 million in losses to the plan's value between 2007 and 2010. *Id*. at 1618.

Lower courts dismissed the action because the plaintiffs had suffered no concrete injury. As participants in a defined-benefit plan, they received the same lump-sum payment each month, and the amount of that payment (the "defined benefit") did not change when the value of the plan's corpus increased or decreased. The Supreme Court affirmed, holding that the plaintiffs did not have Article III standing because they "have received all of their monthly benefit payments" and would have received "the exact same monthly benefits that they are already slated to receive" whether they ultimately won or lost the lawsuit. *Id*. at 1619. Their benefits "are fixed and will not change, regardless of how well or poorly the plan is managed." *Id*. at 1620. In this way, the court concluded that defined-benefit plans are "more in the nature of a contract." *Ibid*.

*Thole* is distinguishable from this case and has no precedential and little persuasive value in the context of the case at bar. This is because Omnicom's 401(k) savings plan is a *defined-contribution* plan, not a *defined-benefit* plan.  In defined-contribution plans, "retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions." *Id*. at 1618. The benefits paid out to participants can and do fluctuate based on the investment decisions of those managing the plan. In this regard, defined-contribution plans are less like a contract and more like a trust, where "the value of the trust property and the ultimate amount of money received by the beneficiaries will typically depend on how well the trust is managed, so every penny of gain or loss is at the beneficiaries' risk." *Id*. at 1619. Any amount lost because of a bad decision has repercussions for the participant such that it could be cognizable as an injury-in-fact.

For the Supreme Court, it was "*Of decisive importance to this case*, [that] the plaintiffs' retirement plan is a defined-benefit plan, *not a defined-contribution plan*." *Id*. at 1618 (emphasis added). *Thole* discussed only Article III standing for plaintiffs who were participants in defined-benefit plans. Indeed, Justice Kavanagh, who wrote the majority opinion in *Thole,* took pains to note that defined-benefit plan participants were "not similarly situated to the beneficiaries of a private trust or to the participants in a defined-contribution plan." *Id*. at 1619.

Judges of this court confronted by motions to dismiss since *Thole* have taken the Supreme Court at its word, and have held that the case has little or no relevance when evaluating standing in ERISA cases concerning defined-contribution plans. *See, e.g., Brown v. Daikin Am., Inc.*, No. 18-cv-11091 (PAC), 2021 WL 1758898, at *4 (S.D.N.Y. May 4, 2021); *Cates v. Trustees of Columbia Univ.*, No. 16-cv-6524 (GBD), 2021 WL 964417, at *1 (S.D.N.Y. Mar. 15, 2021). I agree and will follow my colleagues' lead by rejecting Omnicom's argument based on *Thole*.

2. Plaintiffs nevertheless lack standing to sue for injuries to the Plan incurred by funds in which they did not invest

But just because *Thole* is of limited applicability to this case does not mean that plaintiffs have demonstrated that they have standing to sue for injuries suffered by the Plan from the Neuberger Berman and Morgan Stanley funds – products in which they did not personally invest. Class action plaintiffs must still "allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).

In *Long Island Head Start*, the Second Circuit held that, under ERISA, statutory "Standing is conferred upon certain classes of plaintiffs whose common interest is in the financial integrity of the plan to seek remedies against the misuse of plan assets. The basic standing issue is whether the plaintiff is within the zone of interests ERISA was intended to protect." *Head Start*, 710 F.3d

at 65 (cleaned up). The case was brought on behalf of a class of participants of a nonprofit organization's welfare benefits plan. The plan was a defined-benefit plan, and defendants argued that plaintiffs failed to state a cause of action under ERISA § 502(a)(2) because they sought a refund of past contributions, rather than "benefits" that were due them under the statute. *Id*. at 66.

The Second Circuit rejected this argument, holding that ERISA § 502(a)(2) permits "recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *Ibid*. (quoting *Larue*, 552 U.S. at 256). Although the case primarily addressed whether plaintiffs had a cause of action under ERISA § 502(a)(2) (traditionally known as "statutory standing"), in a footnote, the court also noted that the plaintiffs had *Article III* standing because they "asserted their claims in a derivative capacity, to recover for injuries to the Plan caused by the Administrators' breach of their fiduciary duties." *Id*. at 67 n.5. This was because plaintiffs had a "continuing interest in protecting the Plan assets, which consisted in part of the funds [plaintiffs] had contributed to the Plan during [their] participation." *Id*. at 66.

Plaintiffs in this case rely cases that cite *Head Start*, which suggest that ERISA plaintiffs have Article III standing to sue for all injuries incurred by a Plan as a result of fiduciary breaches as long as the value of their accounts was impacted by at least one poor Plan investment.  *See, e.g., Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 155 (S.D.N.Y. 2017) (holding that *Head Start* stands for the proposition that "plaintiffs who 'asserted their claims in a derivative capacity' on behalf of a plan established 'injury-in-fact sufficient for constitutional standing' by alleging injuries to that plan" generally (quoting *Head Start*, 710 F.3d at 67 n.5)); *Beach v. JPMorgan Chase Bank*, No. 17-cv-563 (JMF), 2019 WL 2428631, at *4 (June 11, 2019) ("[P]lan participants bringing derivative claims need not show individual harm to establish standing.").

And while *Head Start* addressed only a defined-benefit plan, some courts have applied its holding to defined-contribution plans as well. *See Leber*, 323 F.R.D. at 155.

But *Head Start* "involved a plan in which the fiduciary managed the entirety of the plan's assets on behalf of the participants," meaning that " 'each participant would necessarily be harmed by any losses sustained by the plan as a result of a breach of fiduciary duty.' " *Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019). In other words, the *Head Start* plaintiffs were unable to determine how their contributions to their retirement plans were allocated, so any mismanagement of the plan would have resulted in losses to them personally. Here, however, the Omnicom Plan "is a participant-directed 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan." (Compl. at ¶ 22). In fact, part of the alleged misconduct plaintiffs claim regarding the Active Suite is its status as the Plan's Qualified Default Investment Alternative, which means that "all contributions are automatically invested in the [Active Suite]" unless a participant "direct[s] where their assets should be invested." (Compl. at ¶ 31) Unlike the plaintiffs in *Head Start*, the Omnicom plaintiffs have control over how to direct their contributions. The Omnicom 401(k) Plan "simply empowered the [defendants] to present options to the [plan] participants." *In re UBS ERISA Litig.*, No. 08-cv-6696 (RJS), 2014 WL 4812387, at *7 (S.D.N.Y. Sept. 29, 2014) *aff'd*, *Taveras v. UBS AG*, 612 F. App'x 27 (2d Cir. 2015).

Of specific relevance to this lawsuit, the named plaintiffs did not decide to invest in the Neuberger Berman or Morgan Stanley products. Therefore, allegedly poor performance of those specific products did not "impair the value of plan assets" in the "individual account" of any of the named plaintiffs. *Larue*, 552 U.S. at 256. Although *Larue*, like *Head Start*, was concerned with whether plaintiffs had a cause of action under ERISA § 502(a), this fact is even more critically

16

important when evaluating Article III standing. As the Second Circuit held in affirming a decision by my former colleague (and now Second Circuit judge) Richard J. Sullivan, "An ERISA plan participant lacks standing to sue for ERISA violations that cause injury to a plan but not individualized injury to the plan participant." *Taveras*, 612 F. App'x at 29.

*UBS*/*Taveras* and *Patterson* – both cases decided by Judge Sullivan – provide the appropriate comparators to this lawsuit.

In *UBS*, as here, the plan at issue was a defined-contribution plan – not a defined-benefit plan – and the plan participants had the option to select their own investments and thus "had control over the composition and size of their investments in specific investment options" presented by the plan's managers. 2014 WL 4812387, at *1. The facts thus differed substantially from those in *Head Start*. Judge Sullivan concluded that plan participants lacked standing to sue for losses to the plan that did not affect them personally, holding that a "Plaintiff can only demonstrate a constitutionally sufficient injury by pointing to her *individual account's specific losses* during the class period." *Id*. at *6. *Patterson* had the identical fact pattern, and Judge Sullivan reached the identical result. *Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019) ("Losses incurred by funds in which Plaintiffs did not invest cannot have impaired the value of Plaintiffs' individual accounts.").

By affirming Judge Sullivan's decision in *UBS* – a factually indistinguishable case – I am hard pressed to understand plaintiffs' argument that controlling precedent (meaning *Head Start*) compels a finding that these plaintiffs, whose accounts were not affected by losses incurred due to mismanagement resulting from the inclusion of the Neuberger Berman or Morgan Stanley funds among the Plan's assets nonetheless have *Article III* standing to sue to redress those violations on behalf of the Plan. It seems to me that the Court of Appeals has held precisely the opposite in a

factually indistinguishable case. *Tavares*, 612 F. App'x at 29. This is especially true because *Head Start* – the case responsible for the district court opinions on standing in ERISA cases upon which plaintiffs rely – was concerned with *statutory* standing under § 502(a), mentioning Article III standing only in passing and in a footnote. *See Head Start*, 710 F.3d at 67 n.5.

The fact that an action brought by the Plan's participants to recover for injuries to the Plan (not to themselves) is, of necessity, a derivative action, not a direct action, does not alter that analysis. To be able to sue under ERISA, a plaintiff must assert both: (1) "a cause of action under the applicable statute" – formerly known as "statutory standing"[5] – *and* (2) a constitutionally cognizable injury-in-fact sufficient to confer Article III standing. *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016). While the Second Circuit in *Head Start* noted (again, in dictum and in a footnote) that the fact that plaintiffs were suing derivatively gave rise to Article III standing, it did so in a case in which Article III standing and injury-in-fact could not possibly have been disputed due to the type (defined-benefit) and management style (not participant directed) of the plan at issue. There is not the slightest indication in *Head Start* that the panel ever thought about, let alone concluded, that the mere fact that a plaintiff was suing derivatively conferred Article III standing in a case that was radically factually different. The proof of the pudding is that, in *UBS/Taveras*, the same court had not the slightest difficulty concluding that the plaintiffs lacked Article III standing in a case factually identical to this one.

---

[5] Courts have traditionally considered the issue of "statutory standing," or whether a plaintiff has the ability to sue under a certain statute. "The Supreme Court has recently clarified, however, that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.' " *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark In'tl, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). This is because "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *Lexmark*, 572 U.S. at 128 n.4 (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)).

Nor does the fact that plaintiffs have filed suit as a class action allow them to bypass the "irreducible constitutional minimum" of an injury-in-fact to their own individual accounts. *Lujan*, 504 U.S. at 560. The requirements of Article III are "no less true with respect to class actions than with respect to other suits." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). The fact that plaintiffs could not have been injured by the Plan's inclusion of the Neuberger Berman and Morgan Stanley funds in their asset base is the end of the matter.

Finally, to the extent that *Thole* has anything at all to teach in the context of this very different case, it teaches that there are no shortcuts where Article III standing is concerned – even in ERISA cases, where it has long been the law that plan participants can bring suit on behalf of a plan, and where the law, being remedial, is construed generously in favor of the participants. As the Supreme Court said, "There is no ERISA exception to Article III," so a plaintiff must have a "concrete stake" in the injury to the Plan in order to bring suit. *Thole*, 140 S. Ct. at 1622. I return to *LaRue:* plan participants like plaintiffs can seek redress on behalf of their Plan only do so to the extent that their own accounts have suffered injury – which is to say, they cannot sue for generalized mismanagement, only for mismanagement that caused injury to them as individual participants. *Larue*, 552 U.S. at 256.

Because Plaintiffs here have no "concrete stake" in the alleged mismanagement of the Plan by virtue of its inclusion of the Neuberger Berman or Morgan Stanley funds – funds in which the named plaintiffs elected not to invest – they lack Article III standing to sue on behalf of injuries others may have suffered regarding those funds. To that extent – but only to that extent – the Plaintiffs' complaint must be dismissed with regard to those allegations.

### B. Defendants' Motion to Dismiss Count I Under Rule 12(b)(6) Is Denied

"To survive a motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM), 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'" *Ibid.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

29 U.S.C. § 1104(a)(1), which establishes the requisite duties fiduciaries owe under ERISA, states in relevant part:

> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
>> (A) for the exclusive purpose of:
>>> (i) providing benefits to participants and their beneficiaries; and
>>> (ii) defraying reasonable expenses of administering the plan;
>>
>> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Plaintiffs argue that the facts alleged demonstrate that Omnicom breached its duty of prudence by permitting bad investments to remain in the portfolio while excessive fees piled up.

The Second Circuit has recognized that " 'ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.' " *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*St. Vincent*"), 712 F.3d 705, 718 (2d Cir. 2013) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)). Therefore:

> [A] claim for a breach of fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary—if the complaint "allege[s] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident."

*Ibid.* (quoting *In re Citigroup ERISA Litig.*, 662 F.3d 128, 141 (2d Cir. 2011)). Deciding whether an investment decision was "prudent" requires evaluating whether a prudent person in similar circumstances would have made the same decision. To survive a motion to dismiss, the complaint must contain factual allegations – even circumstantial ones – that "give rise to a '*reasonable* inference' that the defendant committed the alleged misconduct." *Ibid*. However, the challenged decisions must be "based upon information available to the fiduciary at the time . . . and not from the vantage point of hindsight." *Id*. at 716 (quoting *Citigroup*, 662 F.3d at 140).

   1. <u>Prolonged Inclusion of the Fidelity Freedom Active Suite in the Investment Menu</u>

The complaint alleges that the Active Suite consistently underperformed the benchmark Index Suite, while charging much higher management fees, resulting in much higher expense ratios than comparable funds. Yet, Omnicom continued offering the Active Suite – not only as part of its portfolio, but as its default investment option – until sometime in 2019.

Omnicom suggests several reasons why this is not sufficient to plead a viable claim. None of its arguments is convincing.

First, Omnicom argues that imprudence cannot be inferred from the Active Suite's underperformed when compared to the Index Suite. Omnicom insists that plaintiffs' allegation is the equivalent of asserting that the inclusion of actively managed funds in a Plan portfolio is automatically imprudent if there are less expensive, passively managed alternatives available. It claims that actively managed funds cannot be properly compared to passively managed funds when determining whether there has been a breach of fiduciary duty.

But Omnicom mischaracterizes Plaintiffs' position. Plaintiffs use the Index Suite to point out that the Active Suite has consistently underperformed the *benchmark index*. The inclusion of the Index Suite is relevant in this regard because it demonstrates that the Active Suite did not "outperform" the market by any means. Omnicom's failure adequately to monitor the underperforming Active Suite, and its decision to continue offering it as the default investment option up until 2019, raises an inference of imprudence.

Second, Omnicom argues that plaintiffs rely on impermissible hindsight appraisals of performance, and that observations that "an investment's price dropped, even precipitously, does not alone suffice to state a claim under ERISA." *Id.* at 721. Omnicom points out that some of the allegations in the complaint discuss the Active Suite's performance through August 31, 2020, even though the Plan had replaced the Active Suite the year before. (*See* Compl. at ¶¶ 38, 44). It thus argues that plaintiffs fail to allege that the Active Suite actually underperformed during the putative class period. Omnicom also observes that the complaint stated that the Active Suite underperformed the Index Suite in four out of the six years between 2014 to 2020 – which means that it either performed as well as the Index Suite in two of those years or out-performed the Index Suite. Omnicom argues that this does not create an inference of mismanagement.

But this argument ignores the rest of plaintiffs' allegations. Although plaintiffs use the trailing three- and five-year annualized basis comparisons as of August 31, 2020 to compare the Active and Index Suites, plaintiffs use these numbers as an example of how some of the Active Suite funds have "dramatically trailed their respective indices over their respective lifetimes." (Compl. at ¶ 33). For example, two of the Active Suite's underlying investments (the Intrinsic Opportunities Fund and the Large Cap Stock Fund) underperformed their benchmark indices for the *entire class period*; those two funds constituted over 15% of the Plan's portfolio. (Compl. at ¶

35). Moreover, the fact that the Active Suite – which costs much more than the Index Suite – underperformed the Index Suite in four out of six years suggests that it was not a wise option when less expensive and better performing alternatives were available.

Omnicom also ignores plaintiffs' allegations that there were large net outflows from the Active Suite throughout the duration of the class period. The Active Suite lost $16 billion in assets under management from 2014 to 2018. (Compl. at ¶ 42). Drawing all inferences in the plaintiffs' favor, these facts admit of an inference that other asset managers felt that the Active Suite was not a wise investment and made decisions accordingly, while Omnicom either failed to monitor the situation closely enough or ignored the underperformance. At this stage of the litigation, this is enough to state a claim – especially where, as in this case, the allegedly imprudently selected investment was the default investment for unsophisticated Plan participants.

Omnicom again argues that the Index Suite is an inappropriate comparator for the Active Suite when it comes to their fees. It points out that "the existence of a cheaper fund does not mean that a particular fund is too expensive *in the market generally* or that it is otherwise an imprudent choice." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823–24 (8th Cir. 2018); *see also Patterson*, 2019 WL 4934834, at *12 (noting that expense ratios for active and passive funds "cannot be meaningfully compared").

The Court recognizes that some courts have determined that actively managed funds cannot be properly compared to passively managed funds. *See, e.g., Wehner v. Genetech, Inc.*, No. 20-cv-6894 (WHO), 2021 WL 507599, at *10 (N.D. Cal. Feb. 9, 2021) (agreeing that "passively-managed funds are 'not comparable to actively-managed funds in any meaningful way' because the two types of funds 'have different aims, different risks, and different potential rewards that cater to different investors' " (citation omitted)). But the overwhelming trend with district courts

in this Circuit is to defer deciding the question of whether two funds are proper comparators until after discovery. *See, e.g., Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017) (noting that whether two funds were proper comparators raised "factual questions that are not properly addressed on a motion to dismiss"); *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (KBF), 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017) (declining to address defendant's argument that plaintiffs used "patently inappropriate benchmarks" because it "raises factual questions that are not appropriately addressed" at the motion-to-dismiss stage). Deciding whether defendants have breached their fiduciary duty – the ultimate issue in an ERISA case – requires considering whether the overall *process* of decisionmaking was up to standard. The allegations of the complaint raise questions such as *why* Omnicom preferred the Active Suite over the Index Suite, and likely requires a deeper dive into each Suite's investment strategy, prospectus, and industry reputation. These are issues that require factual development and are not properly considered at the motion-to-dismiss stage.

Moreover, the Court must accept plaintiffs' complaint as true, which means that if plaintiffs have plausibly alleged that the Active and Index Suites are comparable, they have stated a claim given the Active Suite's underperformance. In this case, plaintiffs have plausibly alleged that the Active and Index Suites are comparable. The complaint states that the two "appear to follow essentially the same strategy" because they have the same glide path. (Compl. at ¶ 36). Fidelity also uses the same name for both suites – "Freedom Funds" – suggesting that both were under the same umbrella of Fidelity investment products. Courts have denied motions to dismiss when "plaintiffs claim that defendants breached their fiduciary duties by selecting specific retail funds over lower-cost, but otherwise identical, institutional funds." *Cunningham*, 2017 WL 4358769, at

*8 (collecting cases). At this stage, plaintiffs' allegations of similarity make it at least plausible that the two suites will be found to be comparable.

It is worth noting, at the outset of this lawsuit, that the law does not oblige Omnicom to select the best performing or least expensive funds for the Plan's investment portfolio, and ERISA does not make plan managers insurers of investment success. But the question of whether defendants have breached a fiduciary duty requires the resolution of factual issues that cannot be decided at this stage. Critical to a court's analysis of whether there has been a breach will be issues such as what the Omnicom defendants knew about the Active Suite's performance and outlook and when they knew it, as well as what, if any, information they imparted to the Plan's participants so those participants could make informed investment decisions. The key is whether Omnicom's *process* in making its investment decisions was imprudent. And "Even when the alleged facts do not 'directly address[ ] the process by which the Plan was managed,' a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.' " *St. Vincent*, 712 F.3d at 718 (quoting *Braden*, 588 F.3d at 596). Plaintiffs have done so here.

The parties have asked the Court to consider several supplemental authorities they submitted following the close of briefing.

Several of these decisions were issued in cases alleging that a different plan defendant's prolonged inclusion of the Fidelity Freedom Active Suite in its retirement portfolio was a breach of fiduciary duty. All of the courts confronted with claims identical to those in the suit at bar have denied motions to dismiss.

For example, in *In re MedStar ERISA Litig.*, No. 20-cv-1984 (RDB), 2021 WL 391701, at *6 (D. Md. Feb. 4, 2021), the court denied the defendant's motion to dismiss. As here, the plaintiff

25

alleged that "the Active suite [was] riskier and more expensive than the Index suite" and that "the Active suite and most of its components have consistently underperformed the Index suite." The defendant argued that the Active and Index Suites were not fair comparators, but the court held that whether the comparison was fair was a factual question not properly resolved on a motion to dismiss. *Ibid*. Moreover, "the Plaintiffs have not only alleged that the Active suite underperformed in comparison to the Index suite, but also that the Active suite saw an outflow of investment as well as received criticism from different financial news and reporting services." *Ibid*. In essence, the exact same allegations as the ones plaintiffs allege in this case were considered sufficient to survive a motion to dismiss in another case. *See also*, *Jones v. Coca Cola*, No. 3:20-cv-654-FDW-DSC, 2021 WL 1226551, at *5 (W.D.N.C. Mar. 31, 2021); *In re Quest Diagnostics Inc. ERISA Litig.*, No. 20-cv-7935 (SDW), 2021 WL 1783274 (D.N.J. May 4, 2021).

In *Quest,* the court noted that the plaintiffs had identified several "causes for concern" about the retirement plan's investment in Fidelity Active Funds that, taken together, were enough to state a claim for relief; namely, the "comparable, less-expensive Index suite offerings that outperformed their Active counterparts . . . Defendants' Active suite QDIA choice, which unduly exposed plan participants, who may not have stated a clear preference for active management, to the risk of severely underperforming the applicable benchmark," as well as "various media reports expressing skepticism at Fidelity's choices . . . and the fact that almost every Index suite fund 'bears a higher star rating than the corresponding' Active suite fund. *Quest*, 2021 WL 1783274, at *3. These are essentially the same concerned raised by the allegations of the complaint in this case.

Omnicom attempts to counter these cases by arguing that, in each of them, the Plan was still invested in the Active Suite when the lawsuit filed. Omnicom insists that its decision to replace the Active Suite with another suite of funds in 2019 limits the applicability of these other cases.

This argument is unpersuasive. Plaintiffs are asserting a claim for misconduct that spans beginning in 2014 – which is when they say Omnicom's mismanagement began. That the alleged misconduct arguably ended in 2019 is irrelevant to whether or not plaintiffs have stated a claim for relief based on the totality of their allegations. It merely limits the potential injury to the Plan.

The clear weight of authority from courts that have already considered allegations regarding the Fidelity Active Suite is to permit such suits to continue. This Court sees no reason to hold otherwise.

Omnicom cites two supplemental authorities from the Northern District of California, which it insists dismissed allegations similar to those in this case. *See Wehner v. Genetech, Inc.*, No. 20-cv-6894 (WHO), 2021 WL 507599 (N.D. Cal. Feb. 9, 2021); *Davis v. Salesforce*, No. 20-cv-1753-MMC, 2021 WL 1428259 (N.D. Cal. Apr. 15, 2021). In *Wehner*, the court dismissed all three sets of plaintiffs' allegations: that the defendant fiduciaries (1) imposed excessive recordkeeping and administrative fees; (2) imposed excessive management fees; and (3) retained funds that underperformed and were not justified based on the expense ratios. The recordkeeping-fee claim was dismissed because, "Federal district courts in California have held that a plaintiff must plead administrative fees that are excessive in relation to the *specific* services the recordkeeper provided to the *specific plan* at issue." *Wehner*, 2021 WL 507599, at *5. And the management-fee and underperformance claims were dismissed because the court determined that it could not fairly "compare actively managed and passively managed funds in this situation" because the benchmark alternative plaintiff attempted to compare to was not the designated benchmark of the actively managed fund. *Id*. at *10. Similarly, in *Davis*, the court determined that actively managed funds were not comparable to passively managed funds writ large. *Davis*, 2021 WL 1428259, at *5.

27

But neither of these two cases considered the Fidelity Active Suite, and this discussion actually demonstrates why *Wehner* and *Davis* are readily distinguishable. The overwhelming majority of judges in this district do not require that a plaintiff allege why recordkeeping and administrative fees are excessive in relation to the "specific services" the Plan provided; and the trend in this district has been to defer deciding whether certain funds are appropriate comparators until after discovery.

Accordingly, Omnicom's motion to dismiss the claims relating to the Fidelity Freedom Active Suite is denied.

2. Excessive Recordkeeping Fees

Plaintiffs also allege that Omnicom breached its fiduciary duties by overcharging for recordkeeping. They allege that $34 per participant is excessive given that an industry publication – "The 401k Averages Book (20th ed.)" – determined that the average cost of *all* administrative fees (recordkeeping plus additional administrative fees) was $35 per participant. (Compl. at ¶ 50). Omnicom's recordkeeping fees are allegedly even more unacceptable because the $35 per-participant combined fee total was an average charged to plans that were much smaller than Omnicom's – those with 100 participants and $5 million in assets, as opposed to the Omnicom Plan's $2.8 billion in assets and over 36,000 participants. Plaintiffs allege that Omnicom should have been able to negotiate a much lower per-participant recordkeeping fee, noting that Fidelity generally charges recordkeeping fees of no more than $14–$21 per participant. (Compl. at ¶ 51).

Omnicom argues that plaintiffs fail to state a claim because the Court should not rely on The 401k Averages Book as a reference, as it evaluated recordkeeping fees for plans much smaller than Omnicom's, making it implausible that it could prove anything of relevance to this lawsuit.

But Plaintiffs' essential allegation is that, because the Omnicom Plan is much larger than the ones evaluated in the Averages Book, it has a stronger bargaining position than those plans and so should have been able to secure a much lower per-participant fee. Put otherwise, defendants should have been able to use its $2.8 billion in assets under management as leverage to obtain less expensive fees for participants. Whether Omnicom actually would have been able to secure a lower rate – or whether the $34 per-participant fee was reasonable in light of all that will be revealed during discovery – is a matter reserved for later. But plaintiffs have alleged that Fidelity – the purveyor of the Active Suite – charges a much lower rate to other, more comparable plans, which is enough to get them past this motion to dismiss. Courts have denied motions to dismiss ERISA excessive fee claims where, "Plaintiffs allege that Defendants overpaid management fees, [and] the Plan failed to use its size and presumed negotiating power to reduce costs." *Quest*, 2021 WL 1783274, at *4; *see also Sacerdote*, 2017 WL 3701482, at *9.

Defendants' motion to dismiss allegations related to the recordkeeping fees is denied.

3.   Excessively Expensive Investment Menu

Finally, plaintiffs allege that the Plan charged excessive management fees across the board. For example, from 2014 through 2018, the Plan paid out management fees of approximately between 0.46% to 0.49% of its total assets, which was "considerably more than those of comparable plans." (Compl. at ¶ 55). One industry study determined that the average total cost for a plan with over $1 billion in assets was just 0.28% of total assets in 2017. (*Ibid*.). But the Omnicom Plan charged between 0.46% and 0.49% for management fees, alone.

Plaintiffs also allege that Omnicom failed to select more appropriate options by failing to include collective trusts in the Plan's investment menu until 2019. As mentioned, plaintiffs

identified several collective trust alternatives that held the same underlying assets as several mutual funds offered by the Plan, but which had lower expense ratios.

These allegations are sufficient to state a claim. As with the other claims asserted by plaintiffs, Omnicom argues that the pleading is insufficient because the expense ratios for passively managed funds are not comparable to those of actively managed funds. And it argues that the fees were not high because they were justified by their active management. Active investment strategies generally carry higher fees because they rely on fund managers to make constant decisions about the fund.

But all plaintiffs need to allege at this stage is that the fees were excessive in comparison to similar funds. As discussed, whether passively managed funds and actively managed funds are proper comparators cannot be determined at this stage. Plaintiffs have identified funds with similar underlying assets (i.e., those that track the benchmark) with much lower expense ratios; that is enough to state a claim for relief.

Similarly, plaintiffs state a claim for relief with respect to their collective trust allegations. Omnicom's failure to included collective trusts until 2019, which are less expensive than comparable mutual funds, indicates that Omnicom did not adequately consider these investment vehicles during the class period. This raises an inference of imprudence. The fact that collective trusts are now included in the investment menu is irrelevant to evaluating past misconduct.

For all these reasons, Omnicom's motion to dismiss Count I is denied.

### C.  Defendants' Motion to Dismiss Counts II and III is Denied.

Plaintiffs' other two claims are entirely dependent on whether they have stated a claim for breach of fiduciary duty, and because plaintiffs have stated such a claim, Counts II and III also survive Omnicom's motion to dismiss.

30

Count II is a failure-to-monitor claim, which alleges that Omnicom failed to monitor fiduciaries and co-fiduciaries for which it was responsible. Since Omnicom is responsible for appointing, supervising, and removing members of the Administrative Committee that oversees the Plan, it is liable for failing to properly monitor them in administering the Plan. "An appointing fiduciary's duty to monitor his appointees is well-established." *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005).

A failure-to-monitor claim is an extension of a fiduciary's individual obligations to properly manage the assets under his or her control. "Courts recognize that when a fiduciary has and exercises the power to appoint and remove plan administrators, it has the duty to monitor those appointees." *McGowan v. Barnabas Health, Inc.*, No. 20-13119 (KM) (ESK), 2021 WL 1399870, at *8 (D.N.J. Apr. 13, 2021) (collecting cases). Accordingly, "Courts have been willing to find a failure to monitor claim if the plaintiff has adequately alleged a breach of fiduciary duty claim." *Ibid*; *see also Falberg*, 2020 WL 3893285, at *15 ("Because Plaintiff's other ERISA claims survive Defendants' motion . . . Plaintiff's monitoring claim survives as well."). This is a natural extension of a fiduciary's control over a plan's administrators. If those whom the fiduciary supervises are negligent in their duties, then the fiduciary has a duty to remove them. "[I]f a plan administrator continually made poor investment decisions, an administrator discharging its duty to monitor should have noticed." *McGowan*, 2021 WL 1399870, at *5.

Omnicom argues that plaintiffs did not allege specific facts that demonstrate it failed to monitor any fiduciaries it supervised. But this ignores plaintiffs' allegations that Omnicom's Board appointed the members of the Plan's Administrative Committee, and Omnicom was specifically "responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the

Committee." (Compl. at ¶ 84). Plaintiffs have alleged that Omnicom is exclusively responsible for monitoring the fiduciaries under it, and that – as already discussed – those fiduciaries have breached their duties. This is sufficient to state a claim as to Count II.

Finally, in the event that any defendant is not a fiduciary or co-fiduciary under ERISA, plaintiffs allege a claim for a knowing breach of trust. "In the trust context, 'breach of trust' is generally interchangeable with 'breach of fiduciary duty' without any formal distinction between the two." *Reliant Transportation, Inc. v. Division 1181 Amalgamated Transit Union*, No. 18-cv-4561, 2019 WL 6050345, at *5 n.10 (E.D.N.Y. Nov. 14, 2019). The only difference is that a breach-of-trust claim can only be asserted against non-fiduciaries. Courts have generally failed to see any distinction when evaluating breach-of-trust claims versus breach-of-fiduciary-duty claims other than the fiduciary-versus-non-fiduciary consideration. *Ibid*. (collecting cases).

The complaint states a claim for a knowing breach of trust. This count is pleaded in the alternative, which is permissible under Federal Rule of Civil Procedure 8(d)(2). Omnicom argues that plaintiffs have failed to plead this claim because there is nothing in the complaint that states that there was knowing participation by a non-fiduciary in a fiduciary's breach of a duty. But given the roles and the relationships of each of the specific defendants in this litigation and the facts that have now been discussed at length, the natural inference is that the Omnicom defendants all knew – or at the very least should have known – about the alleged mismanagement. Omnicom's motion to dismiss Count III is denied.

### III.    CONCLUSION

For the foregoing reasons, Omnicom's motion to dismiss is granted in part and denied in part in accordance with this opinion. The claims with regard to the Plan's investment in the Neuberger Berman and Morgan Stanley Funds are dismissed; the rest are not. Plaintiffs have ten

business days to file an amended complaint striking those allegations and including the allegations about their investment in the Fidelity Active Suite that were provided by Omnicom, as to which the Court has deemed the pleading amended for the purposes of this motion.

The Clerk of Court is respectfully directed to remove Dkt. No. 19 from the Court's list of open motions.

Dated:  August 2, 2021
New York, New York

_____
United States District Judge

BY ECF TO ALL COUNSEL