UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

In re Omnicom ERISA Litigation

No. 20-cv-4141 (CM)

————————————————————————————

**DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT, DENYING PLAINTIFFS' MOTION TO STRIKE, AND
GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION AND FOR THE APPOINTMENT OF CLASS REPRESENTATIVES
AND CLASS COUNSEL**

McMahon, J.

On August 27, 2021, plaintiffs Carol Maisonette, Shane Tepper, Surfina Adams, Michael

Mensack, and Daniel Dise (together, "Plaintiffs") filed the Second Amended Complaint bringing

this putative class action against Omnicom Group Inc., the Board of Directors of Omnicom Group

Inc., and the Administrative Committee of the Omnicom Group Retirement Savings Plan

(collectively, "Defendants" or "Omnicom") alleging breaches of the fiduciary duty of prudence

pursuant to the Employee Retirement Income Security Act of 1927 (29 U.S.C. § 1001) ("ERISA"),

in connection with the administration of the Omnicom Group Retirement Savings Plan ("the

Plan"). Plaintiffs' allegations include alleged mismanagement due to prolonged inclusion in the

401(k) plan of certain funds and excessive recordkeeping fees and expense ratios.  (*See* Plaintiffs'

Second Amended Complaint, Docket No. 54) (the "SAC").

Multiple motions are pending before the court.

The first of those motions is Plaintiffs' motion to certify this action as a class action and to

appoint the Named Plaintiffs as class representatives and Plaintiffs' counsel – the law firms of

Miller Shah LLP and Capozzi Adler P.C. – as class counsel.  (*See* Docket No. 69).  Plaintiffs seek

certification of a class made up of "all participants in the Plan from May 29, 2014, through entry of judgment." (*Id.*).  Defendants oppose Plaintiffs' motion in part, and cross move for summary judgment in part.  (Docket No. 101).  After the close of class certification briefing, Defendants filed a letter motion raising additional objections to Plaintiffs' proposed class definition.  (Docket No. 114).  Plaintiffs move to strike the letter motion as an impermissible surreply.  (Docket No. 115).

For the reasons discussed below, the pending motions are decided as follows:

1.  Plaintiffs' motion to strike is DENIED;

2.  Defendants' motion for partial summary judgment is GRANTED; and

3.  Plaintiff's motion for class certification is GRANTED, but with a redefined class.

## BACKGROUND

For a full discussion of the facts underlying this action, please refer to this court's August 2, 2022, Decision and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. (Docket No. 52).

The facts which are especially pertinent to the pending motions are briefly summarize below.

### A.  The Parties

There are five named plaintiffs to this action: Carol Maisonette (a resident of Des Plaines, IL); Shane Tepper (San Francisco, CA); Surfina Adams (Astoria, NY); Michael Mensack (Kennersville, NC); and Daniel Dise (Van Nuys, CA) (together, "Plaintiffs").

Each of the named Plaintiffs is a former employee of Omnicom and a current or former participant in the Plan under 29 U.S.C. § 1002(7). Plaintiffs allege that, like all participants in the Plan, they were charged excessive recordkeeping and investment management fees because of

Defendants' failure to negotiate these fees in a prudent manner in accordance with their fiduciary duties.   Plaintiffs each invested in the Plan's target-date fund ("TDF") (explained below) options. Since 2019, each Plaintiff has paid the flat $34 annual recordkeeping fee to Fidelity.  (SAC ¶ 52). The SAC does not plead any facts that indicate what type of fees these Plaintiffs paid prior to 2019.

Defendant Omnicom is a New York corporation headquartered in New York City. The complaint also names as defendants Omnicom's Board of Directors, its Administrative Committee, and John Does 1 through 20 – individual members of the Administrative Committee whose names are currently unknown (together with Omnicom, "Defendants").

### B.  ERISA

Pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 and §1002, the Defendants are fiduciaries of the Plan. As fiduciaries of the Plan, the Defendants are obligated to act for the exclusive benefit of Plan participants, to invest Plan assets in a prudent manner, and to ensure that Plan expenses are fair and reasonable.

To redress injuries to a plan, ERISA authorizes any plan participant to enforce ERISA's fiduciary duties and remedial provisions by filing suit in a representative capacity on behalf of that plan. 29 U.S.C. §§1132(a)(2), 1109(a). Plaintiffs bring this action seeking redress for Defendants' purported breach of their fiduciary duty to the Plan.

### C.  The Plan

Omnicom Group Inc. sponsors the Omnicom Group Retirement Savings Plan (a/k/a the Plan), a defined-contribution plan that is qualified under section 401(k) of the Internal Revenue Code.  (*See* Defendants' Rule 56 Statement of Undisputed Material Facts, Docket No. 103 (the "SOF") at ¶ 1;4); *see also* 26 U.S.C. § 401(k).  Participants in the Plan make tax-deferred contributions to individual accounts and then invest in mutual funds or other vehicles to achieve long-term growth.  (SOF ¶ 2).  As of December 2019, the Plan had over 36,000 participants and

nearly $2.8 billion in assets.  (SOF ¶ 3).  The Plan offers participants a wide variety of investment options from which to choose.  (SOF ¶¶ 4-7); (*see also* Docket Nos. 97-98, the Declaration of Jeff G. Hammel ("Hammel Decl."), Exhibits 18-23).

The Plan is a participant-directed 401(k) plan, meaning that "participants direct the investment of their contributions into various investment options offered by the Plan." (SAC at ¶ 27).  The SAC does not describe what information (if any) the Plan managers provide to Plan participants so that they can select the funds in which they wish to invest.  However, the SAC makes clear that Plan participants have autonomy in making investment decisions. In particular, they decide in which funds to invest; Omnicom administrators did not make these choices for them. Omnicom does, however, offer a "default option" for participants who do not wish (or do not feel competent enough) to select their own investment portfolio. These funds are referred to as the Plan's "Qualified Default Investment Alternative" or "QDIA." (SAC at ¶ 36).

Each participant's Plan account is credited with contributions, employer matching contributions, any discretionary contributions, and the earnings and losses of the portfolio in which a participant is invested.  (SAC at ¶ 27). The Plan pays expenses from Plan assets, and participants generally pay administrative expenses through a reduction of their investment income. (*Id*.).

During the alleged class period – from May 29, 2014, to the present – participants could choose from a range of investment options, including actively and passively managed mutual funds, collective investment trusts, and Omnicom's own common stock.  (SOF ¶ 7).

Plaintiffs maintain that large plans like the Plan have significant bargaining power in the marketplace for retirement services, and this leverage allows prudent fiduciaries to demand low-cost administrative and investment management services.  (SAC ¶ 4; *see also* Docket No. 69 at 3).

Plaintiffs principally challenge three components of the Plan: (i) the target-date fund options; (ii) the non-target date fund options; and (iii) the recordkeeping and administrative fees. Each component is explained below.

### i. The TDF Investment Option

Among the options available during at least a portion of the alleged class period was a suite of "target-date funds," or "TDFs," offered by Fidelity Investments, one of the nation's largest and most popular mutual fund companies, called the "Freedom Funds." (SOF ¶¶ 4-5).

TDFs (like the Fidelity "Freedom Funds") are designed specifically for retirement savings; the funds gradually shift to a more conservative investing strategy as the participant's target retirement date approaches. (SOF ¶ 4); (see also SAC ¶ 33).

Fidelity offered two versions of its Freedom Funds. One version—the "Active Suite"—invests predominantly in mutual funds that are "actively" managed, meaning professional portfolio managers select the underlying investments that make up the funds within the suite. (SAC ¶ 35). The other version – the "Index Suite" – invests in mutual funds that are passively managed, meaning the underlying investments are designed to replicate the performance of a selected benchmark, like the S&P 500 Index.[1]  (Id.).

From December 31, 2009, until sometime in 2019, the Plan offered the Fidelity Freedom Funds Active Suite as the Plan's TDF investment option.  (SOF ¶ 5).  During this time, the Active Suite was also the Plan's "Qualified Default Investment Alternative" or "QDIA," which meant that new contributions were automatically directed to the Active Suite unless the participant directed the contributions to other funds.

---

[1] The Standard and Poor's 500, or simply the "S&P 500" is a stock market index that tracks the stock performance of 500 large companies listed on exchanges in the United States.  It is one of the most commonly followed equity indices.

In 2019, the Plan replaced the Active Suite with the Fidelity "FIAM Blend" Suite, a TDF that invests in a mix of actively and passively managed investments. (*See* SOF ¶ 6).

### ii.   The Non-TDF Investment Options

In addition to the Plan's TDF offerings, Plan participants during the alleged class period could also invest in various non-TDF options. Plaintiffs allege that six of the non-TDF fund options were more expensive than comparable funds: (1) Fidelity Contrafund Class K; (2) Fidelity Diversified International Fund Class K; (3) T. Rowe Price Institutional Large Cap Value Fund; (4) T. Rowe Price Institutional Large Cap Core Growth Fund; (5) Alliance Bernstein Discovery Value Fund Class Z; and (6) William Blair Small-Mid Cap Growth Fund Class I. Plaintiffs originally sought to challenge a seventh non-TDF option – the Neuberger Berman Socially Responsive Fund Class R6 – but the court dismissed from this action any claims challenging the Neuberger Berman Socially Responsive Fund because none of the named Plaintiffs ever elected to invest in that fund (*see* Order on Motion to Dismiss at 1).

### iii.   Recordkeeping and Administrative Fees

Throughout the alleged class period, Fidelity has served as the Plan's trustee and recordkeeper. In those roles, Fidelity was responsible for holding the Plan's assets in trust for its participants and beneficiaries and maintaining Plan-and participant-level account information. (*See* Hammel Decl., Exhibit 83).

The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping expenses can either be paid directly from plan assets, or indirectly *via* a practice known as "revenue sharing" – or a combination of both – or by a plan's sponsor. Revenue sharing payments are payments made by investments within a plan, typically mutual funds, to the plan's recordkeeper

or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

Prior to April 1, 2019, recordkeeping fees and other Plan administrative costs were paid as follows:  Fidelity would make annual revenue credit payments from the funds it received through revenue sharing to a revenue credit account.  The Plan Administrators would direct Fidelity to use amounts held in the revenue credit account to reimburse Omnicom for fees and expenses associated with services provided to the Plan or to pay vendors (including Fidelity) directly.  (*See* Docket No. 117 at 3).  This fee structure is referred to herein as the "revenue sharing" recordkeeping structure or arrangement.

On April 1, 2019, the Plan switched from a revenue sharing model to a flat fee model. Since April 1, 2019, Fidelity has been compensated for its recordkeeping services through a flat $34 annual fee paid by Plan participants.  (SAC ¶ 52; *see also* Docket No. 114 at 2).  Plan participants also pay a $12 annual administrative fee, which Plaintiffs refer to as the "Non-Fidelity" administrative fee.  (*Id.*).

In 2021, Omnicom issued a request for proposal (an "RFP") in order to determine whether Fidelity or another firm should be retained as the Plan's recordkeeper, and to determine appropriate recordkeeping fees and services.   Ultimately, Omnicom retained Fidelity as the Plan's recordkeeper and determined that the flat $34 per participant annual recordkeeping fee remained appropriate.  (SAC ¶ 52).

### D.  Plaintiffs' Claims

Plaintiffs sue derivatively on behalf of the Plan, alleging primarily that Defendants breached their fiduciary duties to the Plan pursuant to ERISA §§ 404(a)(1)(A), (B), and (D) (codified at 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D)).

Plaintiffs also bring claims for failure to monitor, co-fiduciary liability, and knowing participation in a breach of trust (*see* SAC ¶ 88), but each of these claims must be predicated on proof of an underlying fiduciary duty breach. *See Rinehart v. Lehman Bros. Holdings Inc*., 817 F.3d 56, 68 (2d Cir. 2016) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach of the duties imposed under ERISA") (internal citation omitted); *In re Omnicom ERISA Litig*., 2021 WL 3292487, at \*16 (S.D.N.Y. Aug. 2, 2021) (Docket No. 52) (noting that these claims "are entirely dependent on whether [Plaintiffs] have stated a claim for breach of fiduciary duty"). In other words, the breach-of-fiduciary-duty claims are the real gravamen of this lawsuit because every claim asserted is dependent on a breach of fiduciary duty; if Plaintiffs do not prevail on their claims for breach of fiduciary duty, they cannot prevail on their other causes of action, all of which are derivative. *Falberg v. Goldman Sachs Grp., Inc.*, No. 19-cv-9910 (ER), 2020 WL 3893285, at \*15 (S.D.N.Y. July 9, 2020).

Plaintiffs allege that Defendant Omicron breached ERISA's fiduciary duty of prudence in the following three separate ways:

1.      The "TDF Claim:" Plaintiffs allege that Omnicom breached its duty by retaining the Fidelity Freedom Funds Active Suite as the Plan's TDF option, rather than moving to the passively managed, and purportedly cheaper and better performing, Fidelity Freedom Funds Index Suite (the "TDF claim").  (SAC ¶¶ 33-50).

2.      The "Recordkeeping Claim:" Plaintiffs allege that, by failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan (the "recordkeeping claim"). Specifically, Plaintiffs allege that Omnicom breached its duty by allowing Plan participants to be charged a flat $34 per participant annual recordkeeping fee, which

they claim is excessive relative to the recordkeeping fees paid by retirement plans of a similar size. (SAC ¶¶ 51- 54).  Plaintiffs maintain that given its size and negotiating power, the Plan should have been able to negotiate a recordkeeping fee of no more than $14-21 per-participant. (*Id*.). Plaintiffs assert that, as a result, participants paid two to three times more than they should have been paid for such services.  (*Id*.).  In other words, "By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan." (SAC, ¶ 54).

3.      The "Non-TDF Claim:" Plaintiffs allege that Omnicom breached its duty by offering six specific non-TDF investment options that purportedly charged excessive management fees, rather than replacing them with allegedly similar, cheaper investment options (the "non-TDF claim"). (SAC ¶¶ 55-59). Plaintiffs claim that three of those options (Fidelity Diversified International K, Fidelity Contrafund K, and William Blair Small-Mid Cap Growth I) should have been replaced by collective trust versions of the same investment.  (SAC ¶ 57).  As it turns out, none of the Named Plaintiffs invested in non-TDFs, and none of the Named Plaintiffs asserts that he or she was deterred from taking advantage of the non-TDF options because of the costs associated with those funds.  For that reason, the non-TDF claim is being dismissed. (S*ee infra*., Section I.B).

**E.  Procedural Posture**

The instant action arises from the consolidation of two separate actions against Defendants filed on May 29, 2020 (Case No. 20 Civ. 4141, Docket No. 1) and July 31, 2020 (Case No. 20 Civ. 6007, Docket No. 1). The first case was filed by the Capozzi Adler law firm; the second case was filed by the Miller Shaw law firm. The court entered an order consolidating the two actions under the Master Case Number 20 Civ. 4141.  (*See* Docket No. 13).

In the first-filed complaint, the Named Plaintiffs asserted that the Class Period extends from May 29, 2014, through the date of judgment.  (Docket No. 1, ¶ 6).  In the second-filed complaint,  the Named Plaintiffs asserted that the Class Period extends from July 31, 2014, through the date of judgment.  (Case No. 20 Civ. 6007, Docket No. 1, ¶ 54).

In the first-filed complaint, the Named Plaintiffs made the following specific allegations about the Plan's recordkeeping and administrative fees:

- "Defendants failed to leverage the size of the Plan to negotiate for . . .. a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees." (Docket No. 1, ¶ 66).

- "Over the years, this arrangement of placing revenue sharing funds into a Revenue Account before disbursement to pay for Plan expenses deprived Plan participants use of their money and millions of dollars in lost opportunity costs. A more prudent arrangement in this case would have been to select available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees."  (Docket No. 1, ¶ 99).

- "to the extent Defendants held revenue sharing amounts for a prolonged period of time and failed to remit any excess revenue sharing back to Plan participants, this was a further fiduciary breach that cost Plan participants millions of dollars during the Class Period."  (*Id*., ¶ 100).

- "Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services." (*Id*., ¶ 117).

In the second-filed complaint, the Named Plaintiffs  made the following specific allegations about the Plan's recordkeeping and administrative fees:

- "Another obvious indicator of Defendants' breach of their fiduciary duties is the Plan's excessive recordkeeping costs. According to one industry publication, the average cost for recordkeeping and administration in 2017 for plans much smaller than the Plan (plans with 100 participants and $5 million in assets) was $35 per participant. As of

December 31, 2018, the Plan had nearly $2.8 billion in assets and 36,807 participants. As the cost of recordkeeping services is dependent solely on the number of participant accounts, and given the Plan's size, and resulting negotiating power, with prudent management and administration, the Plan would have unquestionably been able to obtain a per-participant cost significantly lower than $35 per participant." (Case No. 20 Civ. 6007, Docket No. 1, ¶ 44).

- "Despite the size and negotiating power of the Plan, participants have paid at least $48 annually for administrative services provided to the Plan, broken down in the Plan's participant disclosure notice as a $34 per-participant recordkeeping fee and an additional $12 per head "Non-Fidelity fee." (*Id.*, ¶ 45).

- "As such, it is clear that Defendants either engaged in virtually no examination, comparison, or benchmarking of the recordkeeping/administrative fees of the Plan to those of other similarly-sized 401(k) plans, or were complicit in paying grossly excessive fees. Had Defendants conducted any examination, comparison, or benchmarking, Defendants would have known that the Plan was compensating Fidelity at an inappropriate level for its size. Plan participants bear excessive fee burden and, accordingly, achieve considerably lower retirement savings, since the extra fees, particularly when compounded, have a damaging impact upon the returns attained by participant retirement savings." (*Id.*, ¶ 46).

- "By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan." (*Id.*, ¶ 47).

In other words, the first-filed complaint specifically pleaded that the excessive recordkeeping fees resulted from the use of a revenue sharing model, and said nothing whatever about any flat fee charge; while the second-filed complaints specifically pleaded that a flat fee charge was excessive, but nothing whatever about the revenue sharing model. Both complaints pleaded class periods that encompassed years when the Plan used the revenue sharing approach (2014 – April 2019) and years when the Plan used the flat fee approach (April 2019 and after).

11

On September 25, 2020, Named Plaintiffs (represented by both law firms) filed a consolidated class action complaint (Docket No. 17) which amended and consolidated the two original actions (the "Consolidated Amended Complaint," or "CAC"). In the CAC, the Named Plaintiffs asserted that the Class Period extends from May 29, 2014, through the entry of judgment. (*Id.*, ¶ 65). The CAC repeats verbatim the allegations made in the second-filed complaint about the Plan's purportedly excessive recordkeeping costs – which allegations, as we have seen, relate only to the flat fee model that was adopted by the Plan in April 2019. (*See* CAC, ¶¶ 50-53). The CAC omitted any factual allegations that were made in the first-filed complaint about the revenue share recordkeeping fee structure that the Plan used prior to April 2019.

Defendants moved to dismiss the Consolidated Amended Complaint on October 26, 2020. (*See* Docket No. 17). On August 2, 2021, the court granted the motion only to the extent of dismissing allegations related to investment funds in which Plaintiffs did not invest. (Docket #52, Order on Motion to Dismiss at 1). Because Plaintiffs could not have been harmed by any mismanagement of funds in which they (by their own choice) did not invest, they could not have suffered any cognizable injury-in-fact that would confer Article III standing. (*Id.*). For that reason, the court dismissed the allegations related to the Plan's offering of two specific non-TDF investment options: the Neuberger Berman Fund and Morgan Stanley Fund. The court was not advised at that time than none of the Named Plaintiffs had invested in any of the non-TDF options; that fact would surface later.

Plaintiffs filed the SAC on August 27, 2021. In this pleading, the Named Plaintiffs dropped the claims that had been dismissed. (Docket No. 54). Plaintiffs did not change the pleaded class period (May 29, 2014 - date of judgment) or add to or otherwise amend any of the factual allegations that had appeared in the CAC. This means that the factual allegations relating to

excessive recordkeeping fees addressed only the flat fee model; there were no specific factual allegations relating to the revenue sharing arrangement that had been used for many years prior to 2019.

The Civil Case Management Order gave Named Plaintiffs until February 18, 2022, to amend the SAC.  No effort was made to amend that pleading; it remains the operative pleading in this case.  (*See* Civil Case Management Order at 1, Docket No. 65).

On February 18, 2022, Plaintiffs moved to certify the proposed putative class on all claims, and for the appointment of Named Plaintiffs as class representatives and of Plaintiffs' counsel as class counsel.  (Docket No. 69).  Specifically, Plaintiffs propose that the following class be certified: "All participants and beneficiaries" of the Plan "from May 29, 2014, to the present." (Docket No. 73).

Defendants filed an "opposition and motion for partial summary judgment" in response to Named Plaintiffs' motion for class certification.  Defendants did not oppose certification of a class. However, they disagreed with plaintiffs' class definition, which they thought was both overbroad (for reasons that were not specified in their brief) and encompassed claims that no Named Plaintiff had standing to pursue – namely, the non-TDF claim, on which Defendants simultaneously sought summary judgment.

In an appendix to their memorandum of law, Defendants proposed that the following class be certified:

"All participants and beneficiaries of the Omnicom Group Retirement Savings Plan who through the Plan: (1) invested in the Fidelity Freedom Fund Active Target-Date Fund Suite (comprising the Fidelity Freedom K Fund for the target-date vintages 2000, 2005, 2010, 2015, 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, and 2060) from May 29, 2014, through entry of

judgment (the "Class Period"), or (2) paid the flat $34 per participant annual recordkeeping fee charged by the Plan's recordkeeper, Fidelity, during the relevant portion of the Class Period, but (3) excluding any individuals who served during the Class Period as members of Omnicom Group Inc.'s board of directors and any individuals who served during 4 the Class Period as members of the Omnicom Group Retirement Savings Plan's Administrative Committee."  (*See* Docket No. 101-1, Appendix: Proposed Class Definition).

The principal effective difference between Named Plaintiffs' and Defendants' proposed class definitions is that, insofar as the class covers persons who allegedly paid excessive recordkeeping fees, Defendants' proposed class includes only those who were overcharged via the flat fee model. Since the flat fee model was not adopted until April 1, 2019, Defendants' proposed definition limits considerably the size of the "recordkeeping class" (which is really a sub-class), and the potential for damages in connection with the recordkeeping claim. In effect, Defendants seek certification of two separate subclasses: one pursuing the TDF claim from May 29, 2014, to the present, and the other pursuing a flat $34 recordkeeping fee claim from April 1, 2019, to the present.

This difference was not called to the attention of the court in the Defendants' opposition brief.  In fact, Defendants devoted exactly one sentence in their brief to the issue of class certification. It said, "To the extent any class is certified, it must be limited to Plaintiffs' Freedom Funds (TDF) and recordkeeping claims." (Docket No. 100 at 3). Defendants did not make any specific arguments about what was wrong with Plaintiffs' proposed definition, other than to say that it improperly included the non-TDF claim. The brief focused entirely on the argument that the non-TDF claims ought to be summarily dismissed, because no Named Plaintiff had invested in

any of the non-TDF options – a fact allegedly revealed during class discovery. (*See* Docket No. 100).

Plaintiffs do not oppose Defendants' motion for partial summary judgment.  (*See* Docket No. 109).  Therefore, all claims relating to the management of the non-TDF options offered under the Plan will be dismissed with prejudice for lack of standing.

What remains to be decided is the parameters of the class to be certified.

On May 13, 2022 – after briefing on the class certification motion closed -- Plaintiffs provided Defendants with a copy of the expert report of Michael Geist. In his report, Mr. Geist calculated damages on the recordkeeping claim, not only on the basis of the $34 flat fee, but also on the basis of the seemingly long-abandoned theory that the revenue sharing recordkeeping fees from 2014-2019 were unduly inflated.

On May 20, 2022, Defendants filed a supplemental letter in opposition to the motion for class certification. It was in this letter – not in their original brief – that Defendants explained why Plaintiffs' proposed class definition was "overbroad."   Defendants alleged that if Plaintiffs' proposed definition were adopted it would allow Plaintiffs to pursue a claim that was not pleaded – a claim for breach of fiduciary duty on the theory that the revenue sharing model generated excessive recordkeeping fees.  (Docket No. 114).  Defendants pointed out that in neither the CAC nor the SAC did Plaintiffs identify as excessive the revenue sharing recordkeeping fee that was charged to some (but not all) Plan participants between 2014 and 2019. Indeed, as the court has outlined above, allegations that appeared in the first-filed complaint relating specifically to the revenue sharing model were not only not incorporated into the second-filed complaint but were dropped entirely from both the CAC and the SAC. Defendants also pointed out that the time for

amending the SAC had expired three months earlier, meaning that it was too late to correct any error by permitting amendment.

In this letter, Defendants also identified a second way in which Plaintiffs' proposed class definition was "overbroad. " Were the court to conclude that revenue sharing recordkeeping fees were encompassed by the SAC, simply defining the class to include all persons who participated in the Plan throughout the class period would sweep in individuals who were not charged the so-called "revenue sharing" recordkeeping and administrative fees between 2014 and 2019. It is conceded that not all participants in the Plans during that period were charged this fee, although it is not clear from the record exactly which participants were charged the revenue sharing recordkeeping and administrative fees.

Defendants claim to have been unable to make these arguments previously because they did not know that Plaintiffs were seeking to recover on a theory that the revenue sharing method of collecting recordkeeping and administrative fees was excessive. (*See* Docket No. 117, Defendants' Memorandum of Law in Opposition to the Motion to Strike, at 1) ("This information came to light only after briefing on Plaintiffs' class certification motion had closed").

Plaintiffs immediately moved to strike Defendants' May 20 letter as an improper sur-reply and an improper attempt to raise additional arguments after the briefing period had closed. (*See* Docket No. 115). Alternatively, Plaintiffs ask the court to consider their reply to Defendants' belated argument set forth in their letter.

Plaintiffs argue that their challenge to the revenue sharing recordkeeping fee structure is not a "new" claim; it is simply a "component" of the recordkeeping claim plead in the SAC. Plaintiffs argue that they could not have included specific allegations about the revenue sharing structure in the SAC because those details were not disclosed in the Plan's public filings, so

Plaintiffs were unaware of that structure until class discovery. This statement is obviously untrue, since the first-filed complaint in this action pleaded (in considerable detail) an overcharge claim based on revenue sharing – specific factual allegations that were dropped from all subsequent versions of the complaint.

Finally, to the extent Plaintiffs' class definition might sweep into the class participants of the Plan who did not pay the revenue sharing recordkeeping fees, Plaintiffs argued such an issue can be easily resolved through a plan of allocation that bars people who did not pay the fee from sharing in the recovery. They urge that this is not a bar to certification of the class they propose.

I will consider the arguments in Defendants' May 20 letter and in Plaintiffs' responsive filings dated May 31, 2022, and June 6, 2022. (Docket Nos. 116, 118). For that reason, Named Plaintiffs' motion to strike the May 20 letter (Docket No. 115) is denied.

## I.    Defendants' Unopposed Motion for Partial Summary Judgment is Granted.

### A.  *Legal Standards*

Summary judgment is designed "to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997). Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Identifying a "genuine" dispute is not necessarily enough to defeat the motion, because not every disputed factual issue is *material* in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248; *see City of New York v. Philadelphia Indem. Ins.*

*Co.*, No. 09 Civ. 7253(CM), 2010 WL 3069654, at \*4-5 (S.D.N.Y. July 27, 2010). In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir. 2001).

To establish Article III standing to bring a claim, a plaintiff must demonstrate that three elements are satisfied: (1) an injury in fact; (2) that is traceable to the defendant's conduct; and (3) that is redressable by a judicial decision in the plaintiff's favor. *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 62 (2d Cir. 2021). And as the "party invoking federal jurisdiction," Plaintiffs bear the burden of establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs must demonstrate standing at every stage of the legal proceeding, and if the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action. *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 299 (2d Cir. 2021) (quoting Fed. R. Civ. P. 12(h)(3)). Defendants are correct that the court's decision to deny a "motion to dismiss on standing grounds does not preclude later consideration on summary judgment or indeed at trial." *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 102 (2d Cir. 2003).

B. *Application*

In this case Plaintiffs concede that there is no issue of fact – none of the named plaintiffs invested in non-TDFs during the proposed class period. As noted above, in the interests of judicial economy and deference to this court's prior holdings in this case, Plaintiffs do not oppose the limited entry of partial summary judgment dismissing the non-TDF claim, "assuming that the Court is not inclined to reconsider its previous standing decision with which Plaintiffs respectfully disagree." (Docket No. 109 at 2).

The court is not in fact inclined to reconsider its previous ruling on standing. That being so, the Defendants' motion must be granted.

When a motion for summary judgment is unopposed "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vermont Teddy Bear Co.*, 373 F.3d at 242. The district court must "examin[e] the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970).

Fortunately, we have already litigated the legal issue raised by Defendants' motion. It is law of the case that the Named Plaintiffs cannot maintain claims with respect to funds in which none of them invested. (Docket No. 52). After class discovery, it seems that none of the Named Plaintiffs has standing to challenge the purportedly excessive management fees charged to those who elect to invest in the non-TDFs offered under the Plan. That being so, Defendants are entitled to summary judgment as a matter of law dismissing the non-TDF claim.

The SAC challenges as excessive what Plaintiffs designate as the "Total Plan Cost," which is the sum of (1) the flat recordkeeping and administrative fees that are charged to every Plan participant and (2) purportedly excessive investment management fees[2] that were charged only to investors in individual non-TDF funds. (*See* SAC ¶¶ 27, 56). It is not clear from the pleading that none of the Named Plaintiffs paid the second component as part of his or her Total Plan Cost.

However, as no Named Plaintiff paid any investment management fees that were charged only to investors in non-TDF funds, none of them has standing to pursue the so-called Non-TDF claim. As the court held in the Order on the Motion to Dismiss, plan participants like Named

---

[2] I hasten to note that these investment management fees were not the same thing as the recordkeeping fees charged to some participants in the Plan on a revenue sharing basis.

Plaintiffs can seek redress only to the extent their own accounts have suffered a cognizable injury. (Order on the Motion to Dismiss at 19).

Plaintiffs concede (though only for the purposes of Defendants' motion for partial summary judgment) that none of the individual Plaintiffs invested in any of the non-TDF options that were available under the Plan.  (*See* Docket No. 109).  And Named Plaintiffs do not allege that the reason they did not invest in any of the non-TDF options had anything to do with the purportedly excessive fees charged in connection with those funds.  Therefore, they were not injured by Defendants' collection of those fees. For that reason, Defendants' unopposed motion for partial summary judgment dismissing the non-TDF claim is granted.

Defendants' letter motion for oral argument on their motion for partial summary judgment (*see* Docket No. 95) is denied.

## II.       The Motion for Class Certification is Granted, but With a Redefined Class

Just as Plaintiffs do not oppose the motion for partial summary judgment, Defendants do not oppose certification of some class in this case.  They do not argue that Plaintiffs' case does not meet the requirements for class certification set forth in Rule 23 of the Federal Rules of Civil Procedure.  Accordingly, there is no reason to engage in an extensive discussion of those factors. The question is not whether some class is to be certified; it is, rather, who might be members of the certified class.

Defendants object to certifying a class as it is defined by Plaintiffs, and instead ask the court to certify a much narrower class – effectively, two separate subclasses.

The first consists of all persons who invested in the Active TDF suite at some point from May 29, 2014, through the entry of judgment. Each member of that subclass has a claim that Defendants breached their fiduciary duty to Plan participants by choosing the Fidelity Freedom

Funds Active Suite as the Plan's TDF option, rather than moving to the passively managed – and purportedly cheaper and better performing – Fidelity Freedom Funds Index Suite. No one disagrees that this subclass should be certified, as long as it excludes excluding any individuals who served during the Class Period as members of Omnicom Group Inc.'s board of directors and any individuals who served during the Class Period as members of the Omnicom Group Retirement Savings Plan's Administrative Committee. The court grants the motion to certify what I will call the "Active TDF" subclass.

Defendants' second proposed subclass is all persons who paid allegedly excessive flat recordkeeping and administrative fees, as pleaded in paragraph 52 of the SAC. The period encompassed by this subclass begins on April 1, 2019.

Defendants do not argue that Plan participants might not also have common claims (of which Named Plaintiffs' claims are typical) that the so-called "revenue sharing" recordkeeping fees paid by some (but not all) TDF Plan participants prior to April 1, 2019, were excessive. But they insist that the operative pleading (the SAC) (and its predecessor, the CAC) do not plead any such claim. By advocating for their proposed class definition, Defendants argue that Plaintiffs are effectively trying to amend the SAC after the date for doing so has passed. (*See* Docket No. 117).

Plaintiffs counter that their challenge to the revenue sharing recordkeeping fees charged prior to 2019 (at which time the Plan shifted to charging the $34 per participant flat fee) is not a *new* claim. Instead, Plaintiffs' challenge to the asset-based revenue sharing fees it is just a *component* of the recordkeeping claim that was laid out in the SAC and all previous pleadings. They point to the following general statements in the SAC: "Another obvious indicator of Defendants' breach of their fiduciary duties is the Plan's excessive recordkeeping costs." (SAC, ¶ 51). "By failing to recognize that the Plan and its participants were being charged much higher

fees than they should have been . …. Defendants breached their fiduciary duties to the Plan." (SAC, ¶ 54). And they argue that these statements are sufficient to plead breach of fiduciary duty claims for allegedly excessive recordkeeping fees throughout the entire class period.  Plaintiffs do not address the fact that the intervening two paragraphs (SAC ¶¶ 52-53) specifically describe the excessive recordkeeping costs as the $34 flat fee and $12 administrative fee, or the fact that neither paragraph 51 nor paragraph 54 alleges that excessive fees were charged throughout the class period.  Nonetheless,  Plaintiffs insist that the SAC pleads that Defendants breached their fiduciary duty with respect to recordkeeping costs *throughout* the entire class period. (Docket No. 116 at 4-5) (emphasis in the original).

Plaintiffs  further argue that the pleadings only allege particulars about the flat recordkeeping and administrative fees because only the flat fee structure was disclosed in the Plan's public filings, and the revenue sharing recordkeeping model –  the structure of the Plan's fee arrangement prior to 2019 – was purportedly not publicly available or known to Plaintiffs when they filed the SAC.  (*See* Docket No. 116 at 4).  But as Defendants correctly point out, the revenue sharing fee arrangement *was* known to Plaintiffs when Plaintiffs filed the SAC.  Indeed, it has been known to them since before this lawsuit began.  The proof of the pudding: The first complaint filed in this lawsuit specifically (and exclusively) pleaded a breach of fiduciary duty because the fees charged via the revenue sharing model were allegedly excessive. (Docket No. 1 at ¶¶ 98-100).

So Plaintiffs' rationale for not specifically including a claim predicated on the revenue sharing theory in the SAC (or, for that matter, in the CAC) is simply untrue.

The facts are clear. Specific allegations about the revenue sharing recordkeeping model (1) were specifically pleaded in the first-filed complaint in this action; (2) were not pleaded in the complaint filed by the second-to-file class plaintiff; (3) were dropped entirely from the CAC,

which was the pleading that replaced the two original complaints (Docket No. 17); and (4) were not reinserted into the SAC (Docket No. 54), which is the operative complaint in this action.

Nowhere in the SAC do Plaintiffs specifically plead that recordkeeping fees were excessive "throughout the class period;" the only period during which they identify excessive recordkeeping fees is the period that began in April 2019, when they began charging the $34 flat fee. Plaintiffs do not plead the excessive flat fee claim as an example; they never say, "*For example*, Plan participants have paid a flat $34 per-participant recordkeeping fee," or "*Among other ways*, Plan participants have paid a flat $34 per-participant recordkeeping fee," or include any other example of allegedly excessive recordkeeping fees in their pleading. (*See* SAC, ¶ 52). And the mere fact that the proposed class period extends back to 2014 does not compel any inference that Plaintiffs intended to plead that the revenue sharing model generated excessive fees; the proposed class period extends back to 2014 because the period encompassed by the TDF Claim begins in 2014.

On these undisputed facts, the only conclusion that this court can draw is that the Named Plaintiffs elected to drop a theory of recovery that had previously been pleaded with great specificity when they consolidated their pleadings. There was no reason why the CAC and the SAC could not have included both the allegations of ¶¶ 52-53 (the flat fee allegations) and the allegations that appeared in the first-filed complaint at paragraph 99. It was Plaintiffs' choice not to do that. Therefore, I agree with Defendants that the recordkeeping claim as alleged in the SAC relates only to the flat fee model, and not to the revenue sharing model.  (*See* SAC, ¶ 52).  And I therefore decline to read back into this lawsuit a theory of recovery that was pleaded and then dropped by Named Plaintiffs two years ago.

I therefore grant the motion to the extent of certifying the following two subclasses:

**First Subclass**: All participants and beneficiaries of the Omnicom Group Retirement Savings Plan who through the Plan: (1) invested in the Fidelity Freedom Fund Active Target-Date Fund Suite (comprising the Fidelity Freedom K Fund for the target-date vintages 2000, 2005, 2010, 2015, 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, and 2060) from May 29, 2014, through entry of judgment (the "Class Period").

**Second Subclass**: All participants and beneficiaries of the Omnicom Group Retirement Savings Plan who through the Plan paid the flat $34 per-participant annual recordkeeping fee charged by the Plan's recordkeeper, Fidelity, or the $12 per-participant administrative fee during the relevant portion of the Class Period (April 1, 2019, through entry of judgment).

Excluded from the subclasses are any individuals who served during the Class Period as members of Omnicom Group Inc.'s board of directors and any individuals who served during the Class Period as members of the Omnicom Group Retirement Savings Plan's Administrative Committee.

**Lead Plaintiffs**: The court also sees no reason to deny certification of the Named Plaintiffs as representatives of the class.

**Lead Counsel**: Plaintiffs move this court to appoint the law firms of Miller Shah LLP and Capozzi Adler P.C. as class counsel. As I have said repeatedly, having more than one lead class counsel runs up fees, because I have yet to see a co-counseled situation that did not result in considerable duplicate work. So Named Plaintiffs need to select one law firm to serve as class counsel.

I leave this decision to the Named Plaintiffs. If I knew more about how the revenue sharing aspect of the recordkeeping fee claim disappeared from the CAC and the SAC I might be able to

make the choice myself. As I do not, the choice belongs to the clients. Plaintiffs have until September 1, 2022, to select which firm will serve as lead counsel.

And lest counsel think they can come to some private arrangement to get around this ruling, I remind them that I recently disqualified a well-known class action law firm from serving as lead counsel when it came to light that the lead counsel firm was allowing a second firm – one that the court has specifically not authorized to serve as lead counsel, in order to save on fees charged to the class – to serve as *de facto* co-counsel, without the knowledge or permission of the court. *See In re Allergan PLC Sec. Litig.*, No. 18-CIV-12089 (CM) (GWG), 2020 WL 5796763, at *3 (S.D.N.Y. Sept. 29, 2020).

Plaintiffs' motion for class certification and for appointment of class representatives is GRANTED.  Plaintiffs' motion for appointment of *firms* (plural) as class counsel is DENIED.

## CONCLUSION

This decision will temporarily be filed under seal.  In accordance with this court's prior order temporarily sealing certain documents referencing material that the parties deem to be confidential (*See* Docket No. 67), the parties have until August 22, 2022 to identify any portion of the moving papers, corresponding exhibits, and this decision that should remain under seal because they contain the sort of information that is properly filed under seal.  Pages and paragraphs in this opinion and in briefs must be identified with specificity, as must exhibits or portions thereof, and each designation must be accompanied by an explanation of why sealing should be permitted in light of the presumption of public access.  After I have received any submissions, I will make the necessary rulings and this opinion will be publicly filed, either in its entirety or in appropriately redacted form.  The parties should be aware that, as of the present moment, I see no reason to redact anything from this opinion.

This constitutes the opinion and order of the court.  It is a written opinion.  The clerk

of the court is directed to file this opinion under seal and to close the motions at

Docket Numbers 69, 94, 95, 96, and 115.

Dated: August 11, 2022
New York, New York

_____

U.S.D.J.

BY ECF TO ALL COUNSEL