## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Omnicom Group, Inc. ERISA Litigation* | Master Case and File No: 1:20-cv-04141-CM<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT** |

## I.     INTRODUCTION

1.      Plaintiffs, Carol Maisonette ("Maisonette"), Shane Tepper ("Tepper"), Surfina Adams ("Adams"), Michael Mensack ("Mensack"), and Daniel Dise ("Dise") (collectively, "Plaintiffs"), individually and as participants in the Omnicom Group Retirement Savings Plan ("Plan"), bring this action under 29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participants and beneficiaries of the Plan, against Defendants, Omnicom Group, Inc. ("Omnicom"), the Board of Directors of Omnicom Group, Inc. ("Board"), the Administrative Committee of the Omnicom Group Retirement Savings Plan ("Administrative Committee" or "Committee"), Alan R. Batkin, Mary C. Choksi, Robert C. Clark, Leonard S. Coleman, Jr., Bruce Crawford, Susan S. Denison, Mark D. Gerstein, Ronnie S. Hawkins, Michael A. Henning, Deborah J. Kissire, Gracia C. Martore, John R. Murphy, Patricia S. Pineda, John R. Purcell, Linda J. Rice, Gary L. Roubos, Valerie M. Williams, and John D. Wren, the individual members of the Board during the Class Period, and Philip J. Angelastro, Michael G. Barlow, Keith Bremer, James A. Cannon, Leslie Chiocco, John C. Doolittle, Robert B. Lorfink, Dana Perry, Denis Streiff, Peter L. Swiecicki, and Randall J. Weisenburger, the individual members of the Administrative Committee during the Class Period (collectively, "Defendants") for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§ 1001, *et seq*., and related breaches of applicable law beginning six years from the date this action was originally filed and continuing to the date of judgment (the "Class Period"). This Third Amended Complaint ("TAC" or "Complaint") is filed pursuant to Federal Rule of Civil Procedure 15(a)(2) and the Court's Decision and Order Granting in Part and Denying in Part Defendants' *Daubert* Motions; and Granting in Part and Denying in Part Defendants' Motion for Summary Judgment (ECF No. 191), which provides Plaintiffs leave to amend the Second Amended Complaint by this date to name the individual members of the Board and the Administrative Committee, who were previously named as "John Doe" parties.[1]

2.    Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (*i.e.*, 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees

---

[1] Since the TAC simply names as parties the individual members of the Board and the Administrative Committee, the TAC relates back to the date of the original pleading. This is because the original complaint asserts the same claims against the Board and the Administrative Committee as are asserted against the individual members of those entities in this TAC. The original complaint also pled that Plaintiffs would seek to add the individual members after their identities were discovered. Accordingly, the individual members of the Board and the Administrative Committee received actual or constructive notice such that they knew or should have known the action would have been brought against them. Similarly, they cannot claim prejudice as a result of this amendment since the Court has granted leave and already found that the parties to the original complaint may be held jointly and severally liable for each of the claims asserted, and recognized the existence of indemnification agreements benefitting the individual members of the Board and the Administrative Committee. Indeed, this TAC results from *Defendants'* own arguments (for the first time) on summary judgment that the individual members of the Board and Administrative Committee are necessary parties. In any event, even if the Court finds that the TAC does not relate back to the date of the original pleading (it does), the substantial majority of losses to the Plan as a result of the breaches pled in this TAC accrued within the statute of limitations that would apply to the TAC if it was filed as a new action.

or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate

in a manner in which participants bear the risk of high fees and investment underperformance.

3.     The importance of defined contribution plans to the United States retirement

system has become pronounced as employer-provided defined benefit plans have become

increasingly rare as an offered and meaningful employee benefit.

4.     As of December 31, 2018, the Plan had 36,807 participants with account balances

and assets totaling nearly $2.8 billion, placing it in the top 0.1% of all 401(k) plans by plan size.[2]

Defined contribution plans with substantial assets, like the Plan, have significant bargaining

power and the ability to demand low-cost administrative and investment management services

within the marketplace for administration of 401(k) plans and the investment of 401(k) assets.

The marketplace for 401(k) retirement plan services is well-established and can be competitive

when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.     Defendants maintain the Plan, and are responsible for selecting, monitoring, and

retaining the service provider(s) that provide investment, recordkeeping, and other administrative

services.  Defendants are fiduciaries under ERISA, and, as such, are obligated to (a) act for the

exclusive benefit of participants, (b) ensure that the investment options offered through the Plan

are prudent and diverse, and (c) ensure that Plan expenses are fair and reasonable.

6.     Defendants have breached their fiduciary duties to the Plan and, as detailed

below, have: (1) failed to fully disclose the expenses and risk of the Plan's investment options to

participants; (2) allowed unreasonable expenses to be charged to participants for administration

of the Plan; and (3) selected, retained, and/or otherwise ratified high-cost and poorly-performing

---

[2]The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016
(pub. June 2019).

investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time that they were chosen for inclusion within the Plan and throughout the Class Period (defined below).

7.    To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under ERISA Sections 409 and 502, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class (the "Class") as the Court may deem appropriate and just under all of the circumstances.

8.    Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

a.    A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

b.    A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

c.    Equitable, legal or remedial relief for all losses and/or compensatory damages;

d.    Attorneys' fees, costs and other recoverable expenses of litigation; and

e.    Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.    THE PARTIES

9.    Maisonette is a former employee of Omincom and participant in the Plan under 29 U.S.C. § 1002(7).  Maisonette is a resident of Des Plaines, Illinois.

10.     During the relevant period, Maisonette's entire Plan balance was invested in the Fidelity Freedom 2015 Fund until the Plan replaced the Freedom Funds with the FIAM Blend Target Date Commingled Pool suite (the "FIAM Blend suite") on or about March 15, 2019. From the date of the transition, Maisonette's entire Plan balance has been invested in the FIAM Blend Target Date 2015 Commingled Pool.

11.     Tepper is a former employee of Omincom and former participant in the Plan under 29 U.S.C. § 1002(7).  Tepper is a resident of San Francisco, California.

12.     During the relevant period, Tepper's entire Plan balance was invested in the Fidelity Freedom 2050 Fund until the Plan replaced the Freedom Funds with the FIAM Blend suite.  From the date of the transition, Tepper's entire Plan balance was invested in the FIAM Blend Target Date 2050 Commingled Pool until he rolled his funds out of the Plan.

13.     Adams is a former employee of Omincom and participant in the Plan under 29 U.S.C. § 1002(7).  Adams is a resident of Astoria, New York.

14.     During the relevant period, Adams' entire Plan balance was invested in the Fidelity Freedom 2030 Fund until the Plan replaced the Freedom Funds with the FIAM Blend suite.  From the date of the transition, Adams' entire Plan balance has been invested in the FIAM Blend Target Date 2030 Commingled Pool.

15.     Mensack is a former employee of Omincom and participant in the Plan under 29 U.S.C. § 1002(7).  Mensack is a resident of Kernersville, North Carolina.

16.     During the relevant period, Mensack's entire Plan balance was invested in the Fidelity Freedom 2055 Fund until the Plan replaced the Freedom Funds with the FIAM Blend suite.  From the date of the transition, Mensack's entire Plan balance has been invested in the FIAM Blend Target Date 2055 Commingled Pool.

17.     Dise is a former employee of Omincom and participant in the Plan under 29 U.S.C. § 1002(7).  Dise is a resident of Van Nuys, California.

18.     During the relevant period, Dise's entire Plan balance was invested in the Fidelity Freedom 2045 Fund until the Plan replaced the Freedom Funds with the FIAM Blend suite. From the date of the transition, Dise's entire Plan balance has been invested in the FIAM Blend Target Date 2045 Commingled Pool.

19.     Omnicom is a public New York corporation headquartered in New York, New York.  Omnicom is a global media, marketing and corporate communications holding company. At all pertinent times, Omnicom has been a fiduciary of the Plan.

20.     The Board appointed "authorized representatives" of Omnicom, including the Administrative Committee and its members, as plan fiduciaries.  The Board and its individual members, through its designee, appointed the individual members of the Administrative Committee (individually and collectively hereafter, the "Administrative Committee").  The Board and its individual members were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Administrative Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets, and the Board and its individual members had responsibility for monitoring the performance of the Administrative Committee.

21.     The Administrative Committee is the Plan Administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at Omnicom's corporate headquarters in New York, New York.  The Administrative Committee and its members are appointed by Omnicom's Chief Financial Officer (in his or her capacity as the Board's designee) to administer the Plan on Omnicom's behalf.

22.     Alan R. Batkin was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Batkin is a resident of Greenwich, Connecticut.  Mr. Batkin's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

23.     Mary C. Choksi was a member of the Board and a fiduciary to the Plan during the Class Period.  Ms. Choski is a resident of Washington, District of Columbia.  Ms. Choski's conduct in furtherance of her fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

24.     Robert C. Clark was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Clark is a resident of Cambridge, Massachusetts.  Mr. Clark's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

25.     Leonard S. Coleman, Jr. was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Coleman is a resident of Atlantic Highlands, New Jersey.  Mr. Coleman's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

26.     Bruce Crawford was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Crawford is a resident of New York, New York.  Mr. Crawford's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

27.     Susan S. Denison was a member of the Board and a fiduciary to the Plan during the Class Period.  Ms. Denison is a resident of New York, New York.  Ms. Denison's conduct in

furtherance of her fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

28.     Mark D. Gerstein was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Gerstein is a resident of Highland Park, Illinois.  Mr. Gerstein's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

29.     Ronnie S. Hawkins was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Hawkins is a resident of Harrison, New York.  Mr. Hawkins' conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

30.     Michael A. Henning was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Henning is a resident of Folly Beach, South Carolina.  Mr. Henning's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

31.     Deborah J. Kissire was a member of the Board and a fiduciary to the Plan during the Class Period.  Ms. Kissire is a resident of Dallas, Texas.  Ms. Kissire's conduct in furtherance of her fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

32.     Gracia C. Martore was a member of the Board and a fiduciary to the Plan during the Class Period.  Ms. Matore is a resident of Great Falls, Virginia.  Ms. Martore's conduct in furtherance of her fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

33.     John R. Murphy was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Murphy is a resident of St. Simons Island, Georgia.  Mr. Murphy's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

34.     Patricia S. Pineda was a member of the Board and a fiduciary to the Plan during the Class Period.  Ms. Pineda is a resident of La Cañada Flintridge, California.  Ms. Pineda's conduct in furtherance of her fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

35.     John R. Purcell was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Purcell is a resident of Juno Beach, Florida.  Mr. Purcell's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

36.     Linda J. Rice was a member of the Board and a fiduciary to the Plan during the Class Period.  Ms. Rice is a resident of Chicago, Illinois.  Ms. Rice's conduct in furtherance of her fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

37.     Gary L. Roubos was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Roubos is a resident of Edwards, Colorado.  Mr. Roubos' conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

38.     Valerie M. Williams was a member of the Board and a fiduciary to the Plan during the Class Period.  Ms. Williams is a resident of Houston, Texas.  Ms. Williams' conduct

in furtherance of her fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

39.     John D. Wren was a member of the Board and a fiduciary to the Plan during the Class Period.  Mr. Wren is a resident of Greenwich, Connecticut.  Mr. Wren's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Board occurred in New York, New York.

40.     Philip J. Angelastro was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Mr. Angelastro is a resident of Rye, New York.  Mr. Angelastro's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

41.     Michael G. Barlow was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Mr. Barlow is a resident of Brooklyn, New York.  Mr. Barlow's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

42.     Keith Bremer was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Mr. Bremer is a resident of Scotch Plains, New Jersey.  Mr. Bremer's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

43.     James A. Cannon was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Mr. Cannon is a resident of Wyckoff, New Jersey.  Mr. Cannon's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

44.     Leslie Chiocco was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Ms. Chiocco is a resident of Englewood, New Jersey.  Ms. Chiocco's conduct in furtherance of her fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

45.     John C. Doolittle was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Mr. Doolittle is a resident of Fairfield, Connecticut.  Mr. Doolitte's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

46.     Robert B. Lorfink was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Mr. Lorfink is a resident of Allendale, New Jersey.  Mr. Lorfink's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

47.     Dana Perry was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Mr. Perry is a resident of New Canaan, Connecticut.  Mr. Perry's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

48.     Denis Streiff was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Mr. Streiff is a resident of Old Greenwich, Connecticut.  Mr. Streiff's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

49.     Peter L. Swiecicki was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Mr. Swiecicki is a resident of New York, New

York.  Mr. Swiecicki's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

50.     Randall J. Weisenburger was a member of the Administrative Committee and a fiduciary to the Plan during the Class Period.  Mr. Weisenburger is a resident of Greenwich, Connecticut.  Mr. Weisenburger's conduct in furtherance of his fiduciary responsibilities to the Plan as a member of the Administrative Committee occurred in New York, New York.

51.     The individual members of the Board and the Administrative Committee, by virtue of their membership in the relevant entities, are fiduciaries of the Plan.

### III.   JURISDICTION AND VENUE

52.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

53.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

54.      Venue is proper in this District pursuant to ERISA Section 502(e), 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Omnicom's principal place of business is in this District. Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

55.     Plaintiffs have standing to bring this action.  ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court.  In addition, although

standing under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

<h3 style="text-align:center">IV.    <u>FACTUAL ALLEGATIONS</u></h3>

**A.    <u>Background And Plan Structure</u>**

56.    The Plan is a participant-directed 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays Plan expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The available investment options for participants of the Plan include various mutual funds, collective trusts, and Omnicom common stock.

57.    Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

58.    Collective trusts are, in essence, mutual funds without the SEC regulation.  Collective trusts fall under the regulatory purview of the Office of the Comptroller of the

Currency or individual state banking departments.  Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929.  As a result, collective trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds.  Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plan.  The main advantage of opting for a collective trust, rather than a mutual fund, is the negotiability of the fees, so larger retirement plans are able to leverage their size for lower fees.

59.     The Plan operates, in part, as an employee stock ownership plan ("ESOP"), which enables Omnicom employees to acquire an ownership interest in the company through units of the Omnicom Common Stock Fund.  The fund operates as a unitized fund, meaning participant accounts invest in units which represent a *pro rata* interest in the Plan's investment in Omnicom stock and cash or cash equivalents, which are held in a trust fund.

60.     During the Class Period, Plan assets were held in a trust by the Plan Trustee, Fidelity Management Trust Company.  All investments and asset allocations are performed through this trust instrument.

**B.    Defendants' Breaches of Fiduciary Duties**

61.     As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan.  Plaintiffs did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before this Complaint was filed.

**1.    The Plan's Investment in the Fidelity Freedom Funds**

62.     Among other investments, the Plan lineup offers a suite of thirteen target date funds.  A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the

assumed target retirement year approaches.  Target date funds offer investors dynamic, easy

asset allocation, while providing both long-term growth and capital preservation.  All target date

funds are inherently actively managed, because managers make changes to the allocations to

stocks, bonds and cash over time.  These allocation shifts are referred to as a fund's glide path.

The underlying mutual funds that target date fund managers choose to represent each asset class

can be actively or passively managed.

63.     According to the Plan's Form 5500s,[3] from at least December 31, 2009[4] through

at least March 14, 2019,[5] the Plan offered the Fidelity Freedom fund target date suite.  Fidelity

Management & Research Company ("Fidelity") is the second largest target date fund provider by

total assets.  Among its several target date offerings, Fidelity offers the riskier and more costly

Freedom funds (the "Active suite") and the substantially less costly and less risky Freedom Index

funds (the "Index suite").  Defendants were responsible for crafting the Plan lineup and could

have chosen any of the target date families offered by Fidelity, or those of any other target date

provider.  Defendants failed to compare the Active and Index suites and consider their respective

merits and features.  A simple weighing of the benefits of the two suites indicates that the Index

suite is and has been a far superior option, and consequently the more appropriate choice for the

Plan.  Had Defendants carried out their responsibilities in a single-minded manner with an eye

focused solely on the interests of the participants, they would have come to this conclusion and

acted upon it.  Instead, Defendants failed to act in the sole interest of Plan participants, and

---

[3]The Form 5500 is the annual report that 401(k) plans are required to file pursuant to the
reporting requirements of ERISA.
[4]The Form 5500 provides a detailed schedule of the Plan's holdings at the end of each calendar
year. The suite of Fidelity Freedom funds appears as a Plan investment option as far back as the
2009 Form 5500, the earliest publicly available filing.
[5] On or about March 15, 2019, Defendants replaced the Fidelity Freedom fund suite with the
FIAM Blend suite – a choice which also was an independent breach of fiduciary duty.

breached their fiduciary duty by imprudently selecting and retaining the Active suite for the majority of the relevant period.

64. The two fund families (meaning the Active suite and the Index suite) have nearly identical names and share a management team.[6] But while the Active suite invests predominantly in actively managed Fidelity mutual funds,[7] the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices. The Active suite is also dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset allocation strategy. Defendants' decision to add the Active suite over the Index suite, and their failure to replace the Active suite with the Index suite (or another suitable alternative investment or target date series) at any point during the Class Period, constitutes a glaring breach of their fiduciary duties.

65. Exacerbating Defendants' imprudent choice to add and retain the Active suite is its role as the Plan's Qualified Default Investment Alternative ("QDIA") for as long as it was an option in the Plan investment menu. A retirement plan can designate one of the investment offerings from its lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA. Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA. The Fidelity Freedom fund with the target year that is closest to a participant's assumed retirement age (age 65) served as the QDIA in the Plan until the suite was removed.

---

[6]Both target date suites have been managed by Brett Sumsion and Andrew Dierdorf since 2014. Finola McGuire Foley was added to the Index suite team in 2018.
[7]Per Morningstar, the Active suite's underlying holdings are 88.8% actively managed, by asset weight.

66.     Given that the vast majority of plan participants are not sophisticated investors, many of the Plan participants, by default, concentrate their retirement assets in target date funds. As such, the impact of Defendants' imprudent selection of target date funds is magnified vis-à-vis other asset categories.  Indeed, by December 31, 2018, approximately 32% of the Plan's assets were invested in the Active suite.

        i.     <u>The Active Suite is High-Risk and Unsuitable for Plan Participants</u>

67.     The Active suite chases returns by taking levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan, and particularly those whose savings were automatically invested through the QDIA.  At first glance, the equity glide paths of the two fund families (meaning the Active suite and Index suite) appear nearly identical, which would suggest both target date options have a similar risk profile.  However, the Active suite subjects its assets to significantly more risk than the Index suite, through multiple avenues. At the underlying fund level, where the Index suite invests only in index funds that track segments of the market, the Active suite primarily features funds with a manager deciding which securities to buy and sell, and in what quantities.

68.     The goal of an active manager is to beat a benchmark—usually a market index or combination of indices—by taking on additional risk.  Market research has indicated that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index, which is a significant concern for long-term investors saving for retirement, like the Plan participants in this action.  Actively managed funds tend to charge higher fees than index funds (which are passed on to the target date fund investor through higher expense ratios). These extra costs present an additional hurdle for active managers to clear in order to provide value and compensate investors for the added risk resulting from their decision-making.  Indeed,

Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."[8]  Although they may experience success over shorter periods, active fund managers are rarely able to time the market efficiently and frequently enough to outperform the market.  The Active suite's allocation to primarily actively managed funds subjects investor dollars to the decision-making skill and success, or lack thereof, of the underlying managers and the concomitant risk associated with these investments.  Defendants' choice of the Active suite over more suitable actively- or passively-managed alternatives was likewise a breach of fiduciary duty.

69.    At all times across the glide path, the Active suite's top three domestic equity positions were and are in Fidelity Series funds (funds created for exclusive use in the Freedom funds), two of which have dramatically trailed their respective indices over their respective lifetimes.  The Intrinsic Opportunities Fund, which is currently allocated 8.13% of the total assets in the 2040-2060 Funds, has, over its lifetime, missed its benchmark, the Russell 3000 Index, by an astonishing 326 basis points (3.26%) on an annualized basis.  The Large Cap Stock Fund, which is currently allocated 7.11% of the total assets in the 2040-2060 Funds, has suffered even worse underperformance; its annualized lifetime returns trail that of its benchmark, the S&P 500 Index, by 357 basis points (3.57%).  The portfolio of the Active suite is diversified among 32 underlying investment vehicles; the two aforementioned series funds represent over 15% of the 2040 through 2060 vintages, meaning for at least 20 years (because those target date funds have an associated target retirement date of at least twenty years from now), 15% of investor dollars are subject to the poor judgment exercised by just those two managers.

---

[8]"How Actively and Passively Managed Funds Performed: Year-End 2018";
https://www.morningstar.com/insights/2019/02/12/active-passive-funds.

70.     Compounding the level of risk inherent in the Active suite's underlying holdings is the suite's managers' approach to portfolio construction and asset allocation decisions. Returning to the equity glide paths discussed above, the Active and Index suites appear to follow essentially the same strategy.  The chart below shows the percentage of assets devoted to equities in each vintage.

| Equity Glide Path | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Years to Target Retirement Year | | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

This chart only considers the mix of the portfolio at the level of stocks, bonds and cash.  A deeper examination of the sub-asset classes of the Active suite's portfolio, however, exposes the significant risks its managers take to boost returns.  Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite.  The Active suite also has higher exposure to classes like emerging markets and high yield bonds.

71.     Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction.  In a departure from the accepted wisdom that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts in order to locate underpriced securities, which the firm dubs "active asset allocation." This strategy heaps further unnecessary risk on investors, such as Plan participants, in the Active suite.  A March 2018 Reuters special report[9] on the Fidelity Freedom funds (the "Reuters

---

[9]"Special Report: Fidelity puts 6 million savers on risky path to retirement", https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.

Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk."  The report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Active suite] knew what they were doing."  While many target date fund managers are increasing exposure to riskier investments in an effort to augment performance by taking on additional risk, the president of research firm, Target Date Solutions, states that the Active suite has gone further down this path than its peers.[10]  Morningstar has noted in the past that active management has hindered the Active suite's performance, criticizing a previous poor decision to heavily weight to commodities.  Morningstar similarly characterized Fidelity's shifts in the allocation of stocks between 1996 and 2010 as "shocking" and "seemingly chaotic."  Yet, since 2014, a fund family with a history of poor decisions has been given "carte blanche" to take further risks, to the severe detriment of the Plan and its participants.

72.     This desire and latitude to assume more risk exposes investors in what Fidelity brands "a lifetime savings solution" to significant losses in the event of volatility similar to the downturn experienced during the COVID-19 epidemic.  Morningstar analyst Jeff Holt opines that the popularity of target date funds derives from investors' belief that the funds are designed to "not lose money."  As a result, the average unsophisticated investor, such as the typical participant in the Plan, tends to gravitate toward the all-in-one savings solution a target date fund offers.  Given this reality, Plan participants should be shielded from the riskiest fund families where active manager decisions could amplify losses in periods of market decline.  The Active suite's lack of downside protection has been magnified by the current COVID-19 crisis, and has been felt most sharply by Plan participants approaching their target date, because Plan

---

[10]*Id.*

participants close to retirement age do not have ample time to recoup significant losses before they start withdrawing their retirement savings.  The more conservative Fidelity Freedom Index 2020 Fund has handled the current volatility exceptionally, with year to date returns through July 6, 2020 ranking in the 18th percentile among other 2020 target date funds.[11]  In stark contrast, the Fidelity Freedom 2020 Fund (*i.e.*, part of the Active suite), in which the Plan had over $53 million at the end of 2018, ranks in the 62nd percentile among the same peer group.

### ii.  The Active Suite's Considerable Cost

73.     Even a minor increase in a fund's expense ratio (the total annual cost to an investor, expressed as a percentage of assets) can considerably reduce long-term retirement savings.  The fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low costs.  While the Institutional Premium share class for each target year of the Index suite charges a mere 8 basis points (0.08%), the K share class of the Active suite—which the Plan offers—has expense ratios ranging from 42 basis points (0.42%) to 65 basis points (0.65%).

---

[11]For Morningstar's peer group rankings, 1st percentile is the best performers.

| Cost Comparison | | | | | | |
|---|---|---|---|---|---|---|
| Freedom Suite | Ticker | Exp Rat | Freedom Index Suite | Ticker | Exp Rat | Difference |
| Income K | FNSHX | 0.42% | Income Inst Prem | FFGZX | 0.08% | -0.34% |
| 2005 K | FSNJX | 0.42% | 2005 Inst Prem | FFGFX | 0.08% | -0.34% |
| 2010 K | FSNKX | 0.46% | 2010 Inst Prem | FFWTX | 0.08% | -0.38% |
| 2015 K | FSNLX | 0.49% | 2015 Inst Prem | FIWFX | 0.08% | -0.41% |
| 2020 K | FSNOX | 0.53% | 2020 Inst Prem | FIWTX | 0.08% | -0.45% |
| 2025 K | FSNPX | 0.56% | 2025 Inst Prem | FFEDX | 0.08% | -0.48% |
| 2030 K | FSNQX | 0.60% | 2030 Inst Prem | FFEGX | 0.08% | -0.52% |
| 2035 K | FSNUX | 0.63% | 2035 Inst Prem | FFEZX | 0.08% | -0.55% |
| 2040 K | FSNVX | 0.65% | 2040 Inst Prem | FFIZX | 0.08% | -0.57% |
| 2045 K | FSNZX | 0.65% | 2045 Inst Prem | FFOLX | 0.08% | -0.57% |
| 2050 K | FNSBX | 0.65% | 2050 Inst Prem | FFOPX | 0.08% | -0.57% |
| 2055 K | FNSDX | 0.65% | 2055 Inst Prem | FFLDX | 0.08% | -0.57% |
| 2060 K | FNSFX | 0.65% | 2060 Inst Prem | FFLEX | 0.08% | -0.57% |

74.     The higher fee, charged by the 2040 through 2060 Active funds, represents an annual cost to investors that is over eight times higher than what shareholders of the corresponding Index fund pay.  The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of participants over time. This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



75.     Higher fees significantly reduce retirement account balances over time. Considering just the gap in expense ratios from the Plan's investment in the Active suite to the Institutional Premium share class of the Index suite, in 2018 alone, the Plan could have saved approximately $4.97 million in costs.  This tremendous cost difference goes straight into Fidelity's pockets and is paid for by Plan participants.  As the costs for recordkeeping services have dropped precipitously over the past decade,[12] recordkeepers like Fidelity have been forced to chase profits elsewhere.  The management fees derived from a plan's use of a provider's investment offerings substantially trump any compensation for recordkeeping services.  Thus, Fidelity is heavily incentivized to promote its own investment products, specifically those that charge the highest fees, to each plan for which it recordkeeps, including the Plan.

---

[12] "NEPC: Corporate Defined Contribution Plans Report Flat
Fees," https://www.nepc.com/press/nepc-corporate-defined-contribution-plans-report-flat-fees.

### iii.    Investors Have Lost Faith in the Active Suite

76.    The flow of funds to, or from, target date families constitutes one indicator of the preferences of investors at large.  According to Morningstar's report on the 2019 Target Date Fund Landscape,[13] investor demand for low-cost target date options has skyrocketed in recent years.  Following suit, the Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone.  At the same time, investor confidence in the Active suite has deteriorated; 2018 saw the series experience an estimated $5.4 billion in net outflows.  The movement of funds out of the Active suite has been substantial for years; the Reuters Report notes that nearly $16 billion has been withdrawn from the fund family over the prior four years.  Defendants' act, in offering and maintaining the Active suit in the Plan through the majority of the Class Period, evidences their failure to acknowledge, or act upon, investors' crumbling confidence in the Active suite, while ignoring the simultaneous and justified surge in faith in the Index suite.

### iv.    The 5-Star Index Suite

77.    Morningstar assigns each mutual fund in its extensive database a star rating, which is a "purely mathematical measure that shows how well a fund's past returns have compensated shareholders for the amount of risk it has taken on."  This measurement emphatically favors the Index suite.  Each Fidelity Freedom Index fund bears a higher star rating than the corresponding Active fund (other than the Income and 2005 Index Funds, which have the same 3 stars as the Income and 2005 Active Funds).  With the exception of the Income, 2005, and 2060 iterations, the full Index suite is assigned 5 stars, Morningstar's highest rating.  The risk-adjusted returns of funds with a 5-star rating rank in the top 10% of their peers.  The Active

---

[13] "2019 Target-Date Fund Landscape: Simplifying the Complex."

suite does not achieve a single 5-star rating, and only receives one 4-star rating. Defendants were likely aware, or should have been aware, of the higher ratings of the Index suite, yet continued to offer the Active suite, to the detriment of Plan participants.  Importantly, other actively-managed target date fund suites are ranked substantially higher based upon the same metrics.

| Morningstar Ratings | | | | | |
|---|---|---|---|---|---|
| Freedom Suite | Ticker | Stars | Freedom Index Suite | Ticker | Stars |
| Income K | FNSHX | 3 | Income Inst Prem | FFGZX | 3 |
| 2005 K | FSNJX | 3 | 2005 Inst Prem | FFGFX | 3 |
| 2010 K | FSNKX | 3 | 2010 Inst Prem | FFWTX | 5 |
| 2015 K | FSNLX | 3 | 2015 Inst Prem | FIWFX | 5 |
| 2020 K | FSNOX | 4 | 2020 Inst Prem | FIWTX | 5 |
| 2025 K | FSNPX | 3 | 2025 Inst Prem | FFEDX | 5 |
| 2030 K | FSNQX | 3 | 2030 Inst Prem | FFEGX | 5 |
| 2035 K | FSNUX | 3 | 2035 Inst Prem | FFEZX | 5 |
| 2040 K | FSNVX | 3 | 2040 Inst Prem | FFIZX | 5 |
| 2045 K | FSNZX | 3 | 2045 Inst Prem | FFOLX | 5 |
| 2050 K | FNSBX | 3 | 2050 Inst Prem | FFOPX | 5 |
| 2055 K | FNSDX | 3 | 2055 Inst Prem | FFLDX | 5 |
| 2060 K | FNSFX | 3 | 2060 Inst Prem | FFLEX | 4 |

v.   The Active Suite's Inferior Performance

78.     In the period following the strategy overhaul in 2013 and 2014, the Active suite's higher levels of risk have failed to produce substantial outperformance when compared to the Index suite.  While assuming significantly higher levels of risk with investor dollars (and among them, the Plan participants' hard-earned savings), the Active suite has simply failed to measure up to the returns produced by its index cousin, in which the Plan participants' assets would be significantly better off.[14]  Since the strategic changes took effect in 2014, the Index suite has

---

[14]It bears noting that that Defendants' swap of the Active suite for the FIAM Blend suite does not remedy any of the above identified breaches.  The FIAM Blend suite, while less expensive than the Active suite, is still at least three times as costly as the Index suite across the glide path, despite achieving inferior performance.  The FIAM Blend suite's use of both actively and passively managed strategies renders it a riskier investment option than the Index suite.  Moreover, investors have not "voted with their dollars" by identifying the FIAM Blend pools at

outperformed the Active suite in four out of six calendar years.  Broadening the view to historical measures that encompass a period closer to a full market cycle, the Active suite has substantially underperformed the Index suite on a trailing three- and five-year annualized basis:

| 3-Year Trailing Performance as of 8/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 5.17% | Income Inst Prem | 5.81% | -0.64% |
| 2005 K | 5.68% | 2005 Inst Prem | 6.34% | -0.66% |
| 2010 K | 6.26% | 2010 Inst Prem | 6.98% | -0.72% |
| 2015 K | 6.76% | 2015 Inst Prem | 7.58% | -0.82% |
| 2020 K | 7.15% | 2020 Inst Prem | 8.09% | -0.94% |
| 2025 K | 7.51% | 2025 Inst Prem | 8.46% | -0.95% |
| 2030 K | 8.07% | 2030 Inst Prem | 9.11% | -1.04% |
| 2035 K | 8.45% | 2035 Inst Prem | 9.61% | -1.16% |
| 2040 K | 8.49% | 2040 Inst Prem | 9.73% | -1.24% |
| 2045 K | 8.51% | 2045 Inst Prem | 9.73% | -1.22% |
| 2050 K | 8.50% | 2050 Inst Prem | 9.73% | -1.23% |
| 2055 K | 8.51% | 2055 Inst Prem | 9.74% | -1.23% |
| 2060 K | 8.50% | 2060 Inst Prem | 9.73% | -1.23% |

| 5-Year Trailing Performance as of 8/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 5.35% | Income Inst Prem | 5.25% | 0.10% |
| 2005 K | 6.14% | 2005 Inst Prem | 6.10% | 0.04% |
| 2010 K | 6.86% | 2010 Inst Prem | 6.88% | -0.02% |
| 2015 K | 7.52% | 2015 Inst Prem | 7.64% | -0.12% |
| 2020 K | 8.01% | 2020 Inst Prem | 8.21% | -0.20% |
| 2025 K | 8.42% | 2025 Inst Prem | 8.71% | -0.29% |
| 2030 K | 9.27% | 2030 Inst Prem | 9.69% | -0.42% |
| 2035 K | 9.85% | 2035 Inst Prem | 10.38% | -0.53% |
| 2040 K | 9.89% | 2040 Inst Prem | 10.48% | -0.59% |
| 2045 K | 9.90% | 2045 Inst Prem | 10.48% | -0.58% |
| 2050 K | 9.89% | 2050 Inst Prem | 10.49% | -0.60% |
| 2055 K | 9.89% | 2055 Inst Prem | 10.48% | -0.59% |
| 2060 K | 9.87% | 2060 Inst Prem | 10.48% | -0.61% |

nearly the rate they are investing in the Index suite.  And, while historical performance data for the FIAM Blend suite is generally not publicly available, its annualized returns from April 30, 2020 lag those of the Index suite on a 1-, 3-, and 5-year basis across the glide path, thereby indicating that the choice of the FIAM Blend suite was illogical and a breach of fiduciary duty at the time that Defendants selected it for the Plan.

79.     It is unclear at what point in 2014 the Active suite's major strategic changes were implemented, but using a start date of January 1, June 30, or December 31, 2014, the Index suite has outperformed the Active suite to date.  Investing research and information websites commonly show the growth of $10,000 invested in a mutual fund and a benchmark over a period to provide a comparison of returns in a simple-to-understand format.  Using this method to compare the two suites, at each proposed start date, across every vintage of the fund families, the Index suite would have earned investors significantly greater sums on a $10,000 investment. Defendants breached their fiduciary duty to Plan participants by choosing to select and retain the Active suite, thus causing Plan participants to miss out on greater investment returns for their retirement savings.

### 2.     The Plan's Excessive Recordkeeping Costs

80.     Another obvious indicator of Defendants' breach of their fiduciary duties is the Plan's excessive recordkeeping costs.  According to one industry publication,[15] the average cost for recordkeeping **and** administration in 2017 for plans much smaller than the Plan (plans with 100 participants and $5 million in assets) was $35 per participant.  Other courts have acknowledged that a plan with $3.4 billion in assets and 41,863 active participants should be paying $30 per participant (*Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018)) and that the "market rate" of total administrative fees for "jumbo" plans, *i.e.*, those within the top 1%, should be $35 per participant (*Sacerdote v. New York Univ.*, No. 16-CV-6284 (KBF), 2017 WL 3701482, at *9 (S.D.N.Y. Aug. 25, 2017)).  As of December 31, 2018, the Plan had nearly $2.8 billion in assets and 36,807 participants.  As the cost of recordkeeping services is dependent primarily on the number of participant accounts, as well as the percentage of plan

---

[15]The 401k Averages Book (20th ed.).

assets invested in a recordkeeper's proprietary funds,[16] and given the Plan's size, and resulting

negotiating power, with prudent management and administration, the Plan would have

unquestionably been able to obtain a per-participant cost significantly lower than $30 or $35 per

participant, and should have achieved a per-participant charge of no more than $25 per

participant.

      81.     Plan participants have paid a flat $34 per-participant annual recordkeeping fee.[17]

Given its size and negotiating power, the Plan should have been able to negotiate a

recordkeeping fee of no more than the $25 per-participant figure, which is more than the $14-$21

per-participant figure that Fidelity itself admitted its recordkeeping services were worth.[18]  Thus,

Defendants clearly engaged in a breach of fiduciary duty by allowing the Plan to pay

significantly more than it should have paid for such services if they had engaged in any modestly

prudent approach to ensuring that the Plan's recordkeeping expenses were fair and reasonable.

      82.     As such, it is clear that Defendants either engaged in virtually no competent

examination, comparison, or benchmarking, or competitive bidding with respect to the

recordkeeping/administrative fees of the Plan to those of other similarly-sized 401(k) plans, or

were complicit in paying grossly excessive fees.  Had Defendants conducted any competent

examination, comparison, or benchmarking, or competitive bidding with respect to such fees,

Defendants would have known that the Plan was compensating Fidelity at an inappropriate level

for its size.  Indeed, when Defendants belatedly and tardily conducted a request for proposal with

---

[16]At all relevant times, in excess of 70% of Plan assets were invested in the products of the
Plan's recordkeeper, Fidelity.
[17]In addition, Plan participants also paid a flat "Non-Fidelity" administrative fee of $12 per head.
Although that amount was paid by all participants, such payment was unrelated to
recordkeeping services and therefore is not challenged as independently excessive.
[18]*Moitoso v. FMR LLC*, No. 18-CV-12122 (WGY), 2020 WL 1495938, at *15 (D. Mass. Mar.
27, 2020).

respect to recordkeeping/administrative fees, they failed to leverage the Plan's size and amount

of assets invested in the recordkeeper's proprietary funds to obtain reasonable fees.  Plan

participants bear this excessive fee burden and, accordingly, achieve considerably lower

retirement savings, since the extra fees, particularly when compounded, have a damaging impact

upon the returns attained by participant retirement savings.

83.     By failing to recognize that the Plan and its participants were being charged much

higher fees than they should have been and/or failing to take effective remedial actions,

Defendants breached their fiduciary duties to the Plan.

### V.     ERISA'S FIDUCIARY STANDARDS

84.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan
> solely in the interest of the participants and beneficiaries and -
>
> (A)     for the exclusive purpose of
>
>> (i)     providing benefits to participants and their
>>         beneficiaries; and
>> (ii)    defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)     with the care, skill, prudence, and diligence under the
>         circumstances then prevailing that a prudent man acting in a like
>         capacity and familiar with such matters would use in the conduct
>         of an enterprise of like character and with like aims.

85.     Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets

of a plan shall never inure to the benefit of any employer and shall be held for the exclusive

purposes of providing benefits to participants in a plan and their beneficiaries and defraying

reasonable expenses of administering the plan.

86.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

87.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.

88.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

> (2)     if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

89.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.  Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make

good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.  CLASS ALLEGATIONS

90.     This action is brought as a class action by Plaintiffs on behalf of themselves and

the following certified subclasses (collectively, "Class") pursuant to the Court's order dated

August 11, 2022 (ECF No. 124):

> All participants and beneficiaries of the Plan who through the Plan: (1) invested in the Fidelity Freedom Fund Active Target-Date Fund Suite (comprising the Fidelity Freedom K Fund for the target-date vintages 2000, 2005, 2010, 2015, 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, and 2060) from May 29, 2014, through entry of judgment (the "Class Period").
>
> All participants and beneficiaries of the Plan who through the Plan paid the flat $34 per-participant annual recordkeeping fee charged by the Plan's recordkeeper, Fidelity, or the $12 per-participant administrative fee during the relevant portion of the Class Period (April 1, 2019, through entry of judgment).

Excluded from the Class are any individuals who served during the Class Period as members of

the Board and any individuals who served during the Class Period as members of the

Administrative Committee.

91.     This action may be maintained as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

92.     **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands

of Class members throughout the United States.  As a result, the members of the Class are so

numerous that their individual joinder in this action is impracticable.

93.     **Commonality**.  There are numerous questions of fact and/or law that are common

to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)      Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)      Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)      Whether and what form of relief should be afforded to Plaintiffs and the Class.

94.      **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

95.      **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

96.      **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

97.     **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

98.     **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

99.     **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

100.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

101.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

102.     Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3).

## COUNT I
### (For Breach of Fiduciary Duty)

103.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

104.     Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

105.     To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in

(or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

106.    As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

107.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

108.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

109.    Omnicom and the Board are responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

110.    In light of its appointment and supervisory authority, Omnicom and the Board had a fiduciary responsibility to monitor the performance of the Committee and its members.  In addition, Omnicom, the Board, and the Administrative Committee had a fiduciary responsibility to monitor the performance of the members of the Committee.

111.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan

assets, and must take prompt and effective action to protect the Plan and participants when they are not.

112.    To the extent that fiduciary monitoring responsibilities of Omnicom, the Board, or the Committee was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

113.    Omnicom, the Board, and the Committee breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

114.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Omnicom, the Board, and the Committee discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

115.    Omnicom, the Board, and the Committee are liable under 29 U.S.C. § 1109(a) to

make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

116.     Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

117.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

118.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

119.     To the extent any of the Defendants are not deemed to be fiduciaries and/or not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and other expenses of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand judgment against Defendants for the following relief:

(a)    Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)    Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)    Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)    Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)    Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: December 28, 2022

/s/ Laurie Rubinow
James E. Miller
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
       lrubinow@millershah.com

James C. Shah
Alec J. Berin
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
       ajberin@millershah.com

Anna K. D'Agostino
MILLER SHAH LLP
225 Broadway Street, Suite 1830
New York, New York 10007
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: akdagostino@millershah.com

Kolin C. Tang
MILLER SHAH LLP
1401 Dove Street, Suite 510
Newport Beach, CA 92660
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

*Attorneys for Plaintiffs, the Plan
and the Class*